IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DAVID M. CLAPPER, Individually, §
et al., §
§
Plaintiffs, §
§ Civil Action No. 3:14-CV-2970-D
VS. §
§
AMERICAN REALTY INVESTORS, §
INC., et al., §
§
Defendants. §

MEMORANDUM OPINION
AND ORDER

In this suit alleging claims for fraudulent conveyance, in violation of the Texas

Uniform Fraudulent Transfer Act, ("TUFTA"), Tex. Bus. & Com. Code Ann. § 24.001 *et*

*seq*. (West 2015), unjust enrichment/constructive trust, alter ego, civil conspiracy to commit

fraudulent conveyances, and violation of the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1962, defendants move in four separate motions to dismiss under

Fed. R. Civ. P. 9(b) and 12(b)(6). They have also filed four separate motions for protective

orders to stay discovery until 30 days after the court decides the motions to dismiss. For the

reasons that follow, the court grants in part and denies in part the motions to dismiss, and

grants in part and denies in part the motions for protective orders to stay discovery. The

court grants plaintiffs leave to file a second amended complaint within 28 days of the date

this memorandum opinion and order is filed.

I

In 1999 American Realty Trust, Inc. ("ART") and ART Midwest, Inc. ("ART Midwest") sued David M. Clapper ("Clapper"), Atlantic Midwest, LLC ("Atlantic Midwest"), and Atlantic XIII, LLC ("Atlantic XIII").[1] Following extensive litigation before Judge Buchmeyer and an appeal to the Fifth Circuit, the case was reassigned to Judge Godbey.

After Judge Godbey granted summary judgment partially in favor of Clapper, Atlantic Midwest, and Atlantic XIII (awarding damages totaling over $17 million), the case was tried to a jury ("January 2011 Trial"). After the jury returned a verdict in favor of Clapper, Atlantic Midwest, and Atlantic XIII, Judge Godbey filed a Rule 54(b) final judgment awarding more than $73 million in damages against ART and ART Midwest.

Clapper, Atlantic Midwest, and Atlantic XIII then filed various post-judgment motions to aid in collecting the judgment. Before the motions were decided, however, ART and ART Midwest jointly filed a suggestion of bankruptcy.[2] Clapper, Atlantic Midwest, and

---

[1] In deciding defendants' Rule 12(b)(6) motions, the court construes plaintiffs' amended complaint in the light most favorable to them, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in plaintiffs' favor. *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

[2] Although ART and ART Midwest initially filed for bankruptcy elsewhere, ART's bankruptcy (ART Midwest's was dismissed) was transferred to the United States Bankruptcy Court for the Northern District of Texas in September 2013, and assigned to Judge Hale.

Atlantic XIII learned during the bankruptcy proceedings that, on the eve of the January 2011 Trial, ART had transferred all of its shares of stock in defendant Transcontinental Realty Investors, Inc. ("TCI"),[3] a publicly-traded company, to its wholly-owned subsidiary, defendant EQK Holdings, Inc. ("EQK"), allegedly for little or no value.  Additionally, on January 14, 2011 defendant Basic Capital Management ("BCM"), a wholly-owned subsidiary of EQK, transferred to EQK as a "dividend" 920,507 shares of TCI stock that it held.  ART then transferred EQK, allegedly for no consideration, to ART's then parent, defendant American Realty Investors, Inc. ("ARI").  ARI then transferred its ownership of ART to another affiliated entity, OneRealco, for $10 million in the form of financing provided by ARI, with a five-year note receivable at 3% interest.[4]  In July 2014 the TCI stock held by EQK was transferred directly to ARI, allegedly for insufficient consideration.

In August 2014 Clapper, Atlantic Midwest, and Atlantic XIII filed this suit alleging claims for fraudulent conveyance, in violation of TUFTA, unjust enrichment/constructive trust, alter ego, civil conspiracy to commit fraudulent conveyances, and violation of RICO. The court later denied their motion for a preliminary injunction and temporary restraining

---

[3]Immediately prior to the January 2011 Trial, ART owned no less than 64% and a controlling interest in TCI, a publicly-traded company that owns real estate worth at least $1 billion.  As the majority holder of TCI's stock, ART controlled defendant Income Opportunity Realty Investors, Inc. ("IOT"), a publicly-traded company.  Accordingly, when ART transferred its TCI stock to ARI via the transfer of its wholly-owned subsidiary EQK Holdings, Inc., ART no longer owned any TCI stock or IOT stock.

[4]Clapper, Atlantic Midwest, and Atlantic XIII allege that, in December 2010, ART also transferred its ownership interests in at least 15 entities, with the intent to defraud ART's creditors, by placing its assets out of reach of its creditors.

order. *See Clapper v. Am. Realty Investors, Inc.*, 2015 WL 264711, at *6 (N.D. Tex. Jan. 21, 2015) (Fitzwater, J.).

In four motions, defendants move to dismiss plaintiffs' amended complaint. Defendants Gene E. Phillips ("Gene"), Henry A. Butler ("Butler"), Robert A. Jakuszeweki ("Jakuszeweki"), Sharon Hunt ("Hunt"), Ted. R. Munselle ("Munselle"), Daniel J. Moos ("Moos"), Donald Phillips ("Donald"), Mickey Phillips ("Mickey"), Ryan Phillips ("Ryan"), Gene Bertcher ("Bertcher"), and Louis Corna ("Corna") (collectively, the "Individual Defendants") move to dismiss under Rules 9(b) and 12(b)(6). Defendants ARI, ART, BCM, and EQK (collectively, the "Entity Defendants") move to dismiss under Rules 9(b) and 12(b)(6). Defendants TCI, Income Opportunity Realty Investors, Inc. ("IOT"), Pillar Income Asset Management, Inc. ("Pillar"), Prime Income Asset Management, Inc. ("Prime"), Prime Income Asset Management, LLC ("Prime LLC"), Syntek West, Inc. ("Syntek"), Realty Advisors, LLC ("Realty Advisors"), Realty Advisors, Inc. ("RAI"), Realty Advisors Management, Inc. ("RAMI"), The May Trust, and The Martin Trust (collectively, the "Unrelated Defendants") move to dismiss under Rules 9(b) and 12(b)(6). And defendant Transcontinental Realty Acquisition Corporation ("Transcontinental") appears to move to dismiss under Rule 12(b)(6). Plaintiffs oppose the motions.

Defendants have also filed four separate motions seeking protective orders to stay discovery until 30 days following the court's decision on their motions to dismiss. IOT, RAI, and Realty Advisors filed an April 2, 2015 motion for protective order to stay discovery; Donald, Mickey, Ryan, The May Trust, The Martin Trust, Syntek, and RAMI filed an April

- 4 -

2, 2015 motion for protective order to stay discovery; and Hunt, Munselle, Butler, and

Jakuszeweki filed an April 2, 2015 motion for protective order to stay discovery and request

for hearing.  On April 3, 2015 the court entered an order (which it clarified in an April 9,

2015 order) staying discovery pending a ruling on these motions.  On April 13, 2015

Transcontinental, Pillar, Prime, and Prime LLC filed a motion for protective order to stay

discovery.  The court entered on April 14, 2015 an order temporarily staying discovery

pending a ruling on the motion.

## II

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of

plaintiffs' amended complaint by accepting all well-pleaded facts as true, viewing them in

the light most favorable to the plaintiff[s]."  *Bramlett v. Med. Protective Co. of Fort Wayne,*

*Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *In re Katrina Canal*

*Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)) (internal quotation marks and brackets

omitted).  To survive the motions to dismiss under Rule 12(b)(6), plaintiffs must plead

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff[s]

plead[] factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than

a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S.

at 556); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a

right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (brackets omitted) (quoting Rule 8(a)(2)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. at 678 (citation omitted).

"Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud."  *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)), *aff'd*, 514 Fed. Appx. 513 (5th Cir. 2013).  "[Rule] 9(b) applies to . . . RICO claims resting on allegations of fraud."  *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (citing *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)); *see also Tel- Phonic Servs.*, 975 F.2d at 1138 ("[Rule 9(b)] applies to the pleading of fraud as a predicate act in a RICO claim[.]").  "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *Turner*, 2011 WL 3606688, at *2 (quoting *Benchmark Elecs.*, 343 F.3d at 724) (internal quotation marks omitted).  More colloquially, plaintiffs must plead the "who, what, when, where, and how" of the fraud.  *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare*

*Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).  Because Rule 9(b) must be "read in conjunction

with [Rule] 8 which requires only a short and plain statement of the claim showing that the

pleader is entitled to relief," "punctilious pleading detail" is not required.  *Steiner v.*

*Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, J.) (quoting *Landry*

*v. Air Line Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990)) (internal

quotation marks omitted).  "The court's key concern in assessing a complaint under Rule 9(b)

is to determine whether the plaintiff seeks to redress specific wrongs or whether the plaintiff

instead seeks the opportunity to search out actionable wrongs."  *Garcia v. Boyar & Miller,*

*P.C.*, 2007 WL 2428572, at *4 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.).

III

The court turns initially to defendants' contention that plaintiffs' amended complaint

must be dismissed in its entirety because it relies on group pleading.  Defendants contend

that, like plaintiffs' complaint, their amended complaint is virtually devoid of any detailed

individual allegations and therefore fails to state claims for fraudulent transfer, constructive

trust, alter ego, RICO, and punitive damages.  They maintain that plaintiffs' allegations "still

lump multiple Defendants together for generic acts," citing several examples from the

amended complaint and contending that plaintiffs "have failed to allege any claims upon

which relief can be granted and [that the] Complaint . . . must be dismissed."  Indiv. Ds. Br.

8, 10.

Plaintiffs respond that, where any defendants are "grouped" in the amended

complaint, "it is because the allegations of the conduct apply as to each Defendant

identified." Ps. Indiv. Ds. Resp. Br. 8.  They posit that

> the fact that more than one person may have committed the
> same or similar act or in some way participated in furthering a
> fraudulent transfer by their conduct, warrants identifying each
> person who did the act.  Simply because you identify multiple
> parties in the paragraph does not mean that it is "group
> pleading" in the sense that Defendants claim.  It means that each
> person identified committed the same act.

*Id.* at 9.

The court declines to dismiss plaintiffs' amended complaint on the basis that they

have engaged in group pleading.  Plaintiffs contend that, where paragraphs in the amended

complaint refer to multiple defendants, they intend to allege that each named defendant

committed the alleged acts.  Except, for example, where a statute otherwise requires,[5]

plaintiffs are permitted under federal procedure to allege that more than one defendant (i.e.,

a group of named defendants) committed the same alleged act.  The court therefore declines

to dismiss the amended complaint on the basis that plaintiffs have engaged in impermissible

group pleading, and it turns to defendants' specific challenges to plaintiffs' claims under

Rules 12(b)(6) and/or 9(b).

---

[5]*See, e.g., Fener v. Belo Corp.*, 425 F.Supp.2d 788, 798  (Fitzwater, J.) (pointing out
that group pleading is not permitted in an action covered by the Private Securities Litigation
Reform Act of 1995, 15 U.S.C. § 78u-4).

IV

The court begins with plaintiffs' civil conspiracy claim, which they assert only against certain of the Individual Defendants.[6]

A

The Individual Defendants move under Rule 12(b)(6) to dismiss plaintiffs' claim for civil conspiracy to commit fraudulent conveyances, contending that plaintiffs have failed to identify any Individual Defendants as the recipient of the allegedly transferred assets. They also maintain that, under Texas law, a general creditor, such as plaintiffs, can take advantage of the Texas fraudulent conveyance statute but cannot recover damages for conspiracy to commit a fraudulent conveyance.

Plaintiffs respond by citing various reports filed with the Securities and Exchange Commission ("SEC") showing that, after the transfers in question, the TCI shares were beneficially owned by Hunt, Munselle, Butler, Jakuszeweki, Moos, and Bertcher. Plaintiffs contend that, because this evidence demonstrates that these Individual Defendants are considered transferees who now own the TCI stock, plaintiffs have at least stated a fraudulent

---

[6]Plaintiffs allege that Gene, Mickey, Ryan, Corna, Bertcher, Moos, Hunt, Munselle, Jakuszewski, and Butler conspired to commit fraudulent conveyances. They do not allege that any of the Entity Defendants, the Unrelated Defendants, or Individual Defendant Donald participated in the alleged conspiracy. *See* Ps. Entity Ds. Resp. Br. at 6 ("Plaintiffs have not alleged claims in Count IV of their Amended Complaint against any of the 'Entity Defendants[.]'"); Ps. Unrelated Ds. Resp. Br. at 6 ("Plaintiffs have not alleged claims in Count IV of their Amended Complaint against any of the 'Unrelated Defendants[.]'"). Accordingly, to the extent the Entity Defendants, the Unrelated Defendants, and Donald move to dismiss plaintiffs' civil conspiracy claim, their motions are denied without prejudice as moot.

transfer claim against these defendants.  Plaintiffs also posit that they can recover against all of the Individual Defendants for civil conspiracy to commit fraudulent conveyances of ART's real property because, before the transfer of parcels of real property owned by ART in Dallas, plaintiffs obtained a judgment lien on ART's property in Texas, Florida, and Tennessee.

The Individual Defendants reply that plaintiffs cannot refute the general rule in Texas that a general creditor cannot recover damages for conspiracy to commit a fraudulent conveyance by creating a fact question through judgment liens that were neither discussed in nor incorporated by reference into the amended complaint.

B

In *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806 (Tex. 1979), the Supreme Court of Texas held that "a judgment creditor, with a lien on the property made the basis of a cause of action for conspiracy to prevent the collection of such lien, may recover such damages as result from the conspiracy," but that as to property as to which a plaintiff is "no more than a general creditor," the plaintiff "does not have a cause of action for conspiracy to prevent the collection of a judgment lien."  *Id.* at 808; *see also Mack v. Newton*, 737 F.2d 1343, 1362 (5th Cir. 1984) ("[A] mere general creditor may take advantage of the Texas fraudulent conveyance statute, but . . . may not recover damages for conspiracy to commit a fraudulent conveyance."); *FDIC v. White*, 1998 WL 120298, at *2 (N.D. Tex. Mar. 5, 1998) (Solis, J.) ("the pertinent statutes [including TUFTA] do not create personal liability on the part of a co-conspirator for fraudulent conveyances to an extent or in an amount

- 10 -

beyond property which a co-conspirator actually receives or in which he acquires an interest."). This is because

> a mere general creditor without a lien has no interest in the debtor's property, and hence is not legally injured by any conspiracy with the debtor to aid him in disposing of his property in order to evade the payment of his financial obligations, and cannot maintain an action based upon such conspiracy.

*Estate of Stonecipher*, 591 S.W.2d at 808 (citation omitted).

Plaintiffs do not allege that, as to the allegedly fraudulently transferred property (i.e., the shares of TCI and IOT ), they were more than general creditors. They neither explicitly plead nor contend in their response that they had a judgment lien on the TCI stock or any of the other of ART's assets that are the basis for their fraudulent transfer claim. Accordingly, under *Estate of Stonecipher* plaintiffs cannot state a claim for conspiracy to commit a fraudulent transfer of this stock.[7]

To the extent plaintiffs suggest that their conspiracy claim is based on the Individual Defendants' conspiring to fraudulently transfer real property located in Dallas, against which plaintiffs had previously obtained a judgment lien, they have failed to allege in their amended complaint the existence of a judgment lien. As this court has explained, "[m]otions filed

---

[7]To the extent plaintiffs contend that Hunt, Munselle, Butler, Jakuszeweki, Moos, and Bertcher were the *recipients* of the fraudulently-transferred stock, plaintiffs correctly contend that they can maintain their fraudulent conveyance claim under TUFTA against these individuals. Plaintiffs have failed to plead in their amended complaint, however, that Hunt, Munselle, Butler, Jakuszeweki, Moos, or Bertcher was the recipient of any of the fraudulently-transferred stock, contending only that the stock was transferred among ART, EQK, BCM, and ARI.

under [Rule] 12(b)(6) . . . are designed to test the sufficiency of the pleadings, and courts do not consider materials outside those pleadings in deciding those motions." *Evanston Ins. Co. v. Tonmar, L.P.*, 669 F.Supp.2d 725, 730 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *In re Carmelita, Inc.*, 2009 WL 2356488, at *2 (S.D. Tex. July 29, 2009)).

Accordingly, because plaintiffs have plausibly alleged only that they were general creditors as to the allegedly fraudulently transferred property, and because, under Texas law, a general creditor cannot recover damages for conspiracy to commit a fraudulent conveyance, the court grants the Individual Defendants' motion to dismiss this claim.

V

The court turns next to plaintiffs' TUFTA claim.

A

The Individual Defendants and the Unrelated Defendants move under Rule 12(b)(6) to dismiss plaintiffs' TUFTA claim,[8] contending that because plaintiffs have not pleaded that the Individual Defendants or Unrelated Defendants were transferees or beneficiaries of the fraudulent transfers, plaintiffs have failed to plausibly allege a claim under TUFTA against them.[9]  In their response, plaintiffs posit that, regarding their fraudulent conveyance claim,

---

[8]It is not clear whether plaintiffs intend to assert their TUFTA claim against the Individual Defendants.  But because plaintiffs refer to the Individual Defendants in describing defendants' participation in the allegedly fraudulent transfers, the court will assume *arguendo* that plaintiffs intend to plead this claim against the Individual Defendants.

[9]The Individual Defendants also move to dismiss plaintiffs' TUFTA claim under Rule 9(b).  Because the court concludes that plaintiffs' TUFTA claim asserted against them is subject to dismissal under Rule 12(b)(6), it does not address whether the claim is also subject to dismissal under Rule 9(b).

they are only requesting that the court enter an order setting aside all of the ART transfers,

and, accordingly, their fraudulent conveyance claim is only being asserted "against those

individual Defendants who now claim to have an interest in the property that was

fraudulently transferred."  Ps. Indiv. Ds. Resp. Br. 11.  They contend that, if the court is

unable to set aside all of the ART transfers,

> based on information learned through discovery because of
> conduct undertaken by the Defendants as to that property, then
> and only then do Plaintiffs argue that they would be entitled to
> look to any other Defendant to whom the property was
> transferred [which, based on the SEC reports attached to
> plaintiffs' brief] includes Defendants Hunt, Munselle, Butler,
> Jakuszeweki, Moos and Bertcher.

*Id.* at 12.

## B

> To establish a claim under TUFTA, a plaintiff must prove that
> (1) [it] is a "creditor" with a claim against a "debtor"; (2) the
> debtor transferred assets after, or a short time before, the
> plaintiff's claim arose; and (3) the debtor made the transfer with
> the intent to hinder, delay, or defraud the plaintiff.

*Dontos v. Vendomation NZ Ltd.*, 582 Fed. Appx. 338, 344 (5th Cir. 2014) (per curiam) (citing

*Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 203-05 (Tex. App.

2013, pet. denied)).  TUFTA allows recovery against the debtor, the transferee, or the person

for whose benefit the transfer was made.  *See* Tex. Bus. & Com. Code Ann. §§ 24.008,

24.009; *Mack*, 737 F.3d at 1361 (addressing TUFTA's predecessor, the Uniform Fraudulent

Conveyance Act, and noting that the statute "does not provide for recovery other than

recovery of the property transferred or its value from one who is, directly or indirectly, a

transferee or recipient thereof.").

The majority of plaintiffs' allegations in support of their TUFTA claim involve the transfer of TCI stock. But plaintiffs do not plausibly allege that the TCI stock was directly transferred to any of the Unrelated Defendants or to any of the Individual Defendants, including Hunt, Munselle, Butler, Jakuszeweki, Moos, or Bertcher.[10] Instead, they clearly allege that the TCI stock was transferred *to EQK*, that ART's interest in EQK was transferred *to ARI*, that the TCI stock was then transferred *to ARI*, and that ARI transferred its ownership of ART *to OneRealco*.[11] And although plaintiffs allege generally that the fraudulent transfers were for the defendants' "personal gain and benefit," Am. Compl. ¶ 100; *see also, e.g., id.* ¶¶ 126, 128, most of the allegations are conclusory and do not explain *how* any of the transfers benefited the Individual Defendants or the Unrelated Defendants.[12] *See Iqbal*, 556

---

[10]Nor do plaintiffs allege that any of the other 15 transactions listed in ¶ 97 of the amended complaint resulted in a transfer of ownership interest to the Individual Defendants or to any of the Unrelated Defendants.

[11]Plaintiffs allege that "ART purportedly 'sold' its TCI stock that it directly owned to its then wholly owned subsidiary, Defendant EQK," Am. Compl. ¶ 57; BCM "transferred 920,507 shares of TCI stock it held to Defendant EQK as a 'dividend,'" *id.* ¶ 64; ART "transferred all of its interest in [EQK] directly to Defendant ARI," *id.* ¶ 80; ARI "purportedly transferred its ownership of ART to another affiliated entity, OneRealco," *id.* ¶ 88; and EQK transferred the TCI stock "now directly to Defendant ARI," *id.* ¶ 134.

[12]Plaintiffs rely on evidence filed in support of their response brief that suggests that Hunt, Munselle, Butler, Jakuszeweki, Moos, and Bertcher were recipients of the TCI stock that was transferred in January 2011 and again in April 2014. But plaintiffs have failed to allege these facts in their amended complaint. Accordingly, the court will not rely on this evidence in deciding the Individual Defendants' motion to dismiss. *See, e.g., Evanston Ins. Co.*, 669 F.Supp.2d at 730.

The amended complaint also alleges that Gene "controls" all of the entities, *see, e.g.*, Am. Compl. ¶ 133, but it does not plausibly plead that Gene is the transferee or beneficiary

- 14 -

U.S. at 678.   In ¶ 122 of the amended complaint, plaintiffs assert that Ryan

> is a director of Defendant BCM, a beneficiary of Defendant May Trust and Defendant Martin Trust and as a result, now controls, received, or otherwise has possession of assets that were fraudulently transferred from ART, including but likely not limited to the TCI and IOT stock that ART once owned[.]

Am. Compl. ¶ 122.   In ¶ 130 plaintiffs allege that The May Trust and The Martin Trust "are, in the chain of title, the ultimate owners and controllers of the shares fraudulently conveyed." *Id.* ¶ 130.   To the extent plaintiffs allege that Ryan received, and is now in possession of, the TCI and IOT stock that ART allegedly fraudulently transferred, and that The May Trust and The Martin Trust are the owners of the shares fraudulently conveyed, plaintiffs may be able to recover under TUFTA against these defendants.   *See* Tex. Bus. & Com. Code Ann. § 24.009(b) (permitting creditor to recover judgment for value of asset transferred against "any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee").   Accordingly, the court grants the Individual Defendants' and the Unrelated Defendants' motions to dismiss plaintiffs' TUFTA claim asserted against them, except as to the claim asserted against Ryan, The May Trust, and The Martin Trust.

C

The Entity Defendants move to dismiss plaintiffs' TUFTA claim under Rule 9(b), contending that "[d]espite vague accusatory allegations that 'Defendants' made fraudulent transfers to avoid the Judgment Action debt, [plaintiffs] completely fail to plead any

_____

regarding the TCI or IOT stock.

particular facts that would prove the Entity Defendants are liable for the misconduct alleged," Entity Ds. Br. 10, and that plaintiffs have failed to satisfy the pleading standards of Rules 12(b)(6) and 9(b).

Plaintiffs respond that they have satisfied the pleading standard of Rule 9(b) by identifying the property transferred, the entities and persons involved, when the transfers occurred in light of the claims against ART, and where all of this occurred. The court agrees that plaintiffs' TUFTA allegations are sufficient with respect to the Entity Defendants to satisfy the heightened pleading standard of Rule 9(b). *See, e.g., Biliouris v. Sundance Res., Inc.*, 559 F.Supp.2d 733, 736 (N.D. Tex. 2008) (Godbey, J.) (deciding not to reach question whether Rule 9(b) applied to plaintiffs' TUFTA claim because plaintiffs had pleaded sufficient facts to state fraudulent transfer claim under Rule 9(b)'s more stringent standard).[13]

Plaintiffs allege that "[o]n the eve of the January, 2011 trial," ART purportedly sold its TCI stock to EQK, and that the "transaction was intended to divest [ART] of assets to hinder and delay creditors, in particular, the Plaintiffs, from looking to ART's TCI stock in satisfaction of the judgment against ART in favor of the Plaintiffs." Am. Compl. ¶¶ 57-58. They allege that, on January 14, 2011, BCM transferred 920,507 shares of TCI stock to EQK

---

[13]The court assumes *arguendo* that the heightened pleading standard of Rule 9(b) applies to plaintiff's fraudulent transfer claim asserted against the Entity Defendants. It notes, however, that courts in this circuit have "determined that Rule 9(b) does not apply to fraudulent transfer cases against a transferee where the plaintiff has not properly alleged a fraud claim against that defendant." *Fawaz v. Byers*, 2014 WL 1671746, at *5 (S.D. Tex. Apr. 28, 2014) (citations omitted); *see also Janvey v. Alguire*, 846 F.Supp.2d 662, 675 (N.D. Tex. 2011) (Godbey, J) (noting that whether heightened pleading requirement applies to TUFTA claims "appears to be an open question in the Fifth and some other circuits.").

as a "dividend," and that this dividend was issued in order to "prevent ART's creditors from looking to the TCI shares owned by ART to satisfy ART's obligations." *Id.* ¶¶ 64, 66. Plaintiffs contend that, on January 21, 2011, ART transferred all of its interest in EQK directly to ARI; that this transaction was made to an insider, for little or no consideration, and at a time when ART was already indebted to plaintiffs for at least $17 million and on the eve of a trial during which ART could be found liable to plaintiffs for tens of millions more; and that the purpose of this transfer was to hinder and delay ART's creditors, particularly plaintiffs. *Id.* ¶¶ 80-83. Plaintiffs allege that "[t]en days prior to the commencement of [ART]'s Nevada bankruptcy," ARI sold its 100% ownership interest in ART to One Realco for $10 million, that One Realco had no intention of paying the note for the transfer of ART, and that the transaction was "made with the intent to hinder and delay ART's creditors and prevent Plaintiffs from seeking to look to ART's fraudulently transferred assets . . . to satisfy the judgment against ART in favor of Plaintiffs." *Id.* ¶¶ 114-115, 140. And, finally, plaintiffs allege that the TCI stock once owned by ART was again transferred in July 2014, this time to ARI, "with the intent to further hinder ART's creditors, namely Plaintiffs, and move the TCI stock further away from ART." *Id.* ¶ 134-35. These allegations contain specific facts regarding the transactions on which plaintiffs base their TUFTA claim, including when the transactions occurred, the entities involved in the transactions, how the transactions were accomplished, and facts that suggest that they were undertaken with an intent to hinder and delay ART's creditors. These allegations are sufficient, even under the heightened pleading standard of Rule 9(b), to withstand the Entity Defendants' motion to

dismiss.  Accordingly, the court denies the Entity Defendants' motion to dismiss plaintiffs'
TUFTA claim.

## D

In sum, the court grants the Individual Defendants' motion to dismiss plaintiffs'
TUFTA claim, except as to Ryan; grants the Unrelated Defendants' motion to dismiss
plaintiffs' TUFTA claim, except as to The May Trust and The Martin Trust; and denies the
Entity Defendants' motion to dismiss plaintiffs' TUFTA claim.

## VI

The court now considers plaintiffs' claim for unjust enrichment/constructive trust.

## A

"A party may recover under the unjust enrichment theory when one person has
obtained a benefit from another by fraud, duress, or the taking of an undue advantage."
*Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).  "A key
element of unjust enrichment is that the person sought to be charged wrongly secured or
passively received a benefit."  *Ahmed v. Shah*, 2015 WL 222171, at *5 (Tex. App. Jan. 15,
2015, no pet.) (mem. op.) (citing *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270
(Tex. App. 2004, pet. denied)).  "Unjust enrichment is not a proper remedy 'merely because
it might appear expedient or generally fair that some recompense be afforded for an
unfortunate loss to the claimant [.]'"  *Baxter v. PNC Bank Nat'l Ass'n*, 541 Fed. Appx. 395,
398 (5th Cir. 2013) (per curiam) (quoting *Heldenfels Bros.*, 832 S.W.2d at 40).  "It is not
enough that the person sought to be charged received some incidental benefit."  *Ahmed*, 2015

WL 222171, at *5.

"A constructive trust is not a cause of action under Texas law." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010). Rather, "[a] constructive trust is an equitable remedy used to prevent unjust enrichment." *Baxter*, 541 Fed. Appx. at 398 (citing *Everett v. TK-Taito, LLC*, 178 S.W.3d 844, 859 (Tex. App. 2005, no pet.)); *see also Messier v. Messier*, ___ S.W.3d ___, 2015 WL 452171, at *6 (Tex. App. Jan. 27, 2015, no pet.) ("A constructive trust [may be] imposed when one party holds property that legally belongs to the other." (citing *In re Marriage of Harrison*, 310 S.W.3d 209, 214 (Tex. App. 2010, pet. denied))). "In order to establish a constructive trust, the proponent must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and, (3) tracing to an identifiable res." *Baxter*, 541 Fed. Appx. at 398.

The Individual Defendants move to dismiss plaintiffs' claim for unjust enrichment/constructive trust, contending that they have failed to allege that the Individual Defendants have secured any benefit or obtained any assets from plaintiffs that would be unjust for them to retain. The court agrees as to most of the Individual Defendants. Plaintiffs contend that "[t]he benefit is that the individuals continue to reap the profits and benefits of ownership and control of the TCI stock and the other fraudulently transferred ART property where such a benefit would not have been received by the Defendants if they had not committed fraud." Ps. Indiv. Ds. Resp. Br. 14. But plaintiffs fail to plausibly allege that any of the Individual Defendants (except Ryan, *see supra* § V(B)) is in possession of the TCI stock, the IOT stock, or any of the other allegedly fraudulently transferred assets. Rather,

- 19 -

at least as it concerns the TCI and IOT stock, plaintiffs have specifically alleged that all of that stock is now in Ryan's possession, and that the TCI stock is ultimately owned and controlled by The May Trust and The Martin Trust.  The court therefore grants the Individual Defendants' motion to dismiss plaintiffs' unjust enrichment/constructive trust claim asserted against all of the Individual Defendants except Ryan.

The Unrelated Defendants move to dismiss plaintiffs' unjust enrichment/constructive trust claim on the same basis.  As with plaintiffs' claim against the Individual Defendants, except as to The May Trust and The Martin Trust, plaintiffs fail to plausibly allege that any of the Unrelated Defendants possesses the TCI stock or any of the other allegedly transferred assets.  Accordingly, the court dismisses plaintiffs' unjust enrichment/constructive trust claim asserted against all of the Unrelated Defendants except The May Trust and The Martin Trust.

The Entity Defendants also move to dismiss plaintiffs' unjust enrichment/constructive trust claim, contending that the amended complaint lacks any allegations of a fiduciary relationship between plaintiffs and the Entity Defendants, fails to identify any breach of a fiduciary relationship,[14] and fails to allege that the Entity Defendants have secured any benefit or obtained any assets from plaintiffs that would be unjust to retain.  Although plaintiffs plausibly allege that defendant ARI at one point owned the TCI and IOT stock, they

---

[14]A fiduciary relationship is not a required element of plaintiffs' unjust enrichment/constructive trust claim.  *See Baxter*, 541 Fed. Appx. at 396 ("In order to establish a constructive trust, the proponent must prove: (1) breach of a special trust, fiduciary relationship, *or actual fraud*; (2) unjust enrichment of the wrongdoer; and, (3) tracing to an identifiable res." (emphasis added)).

do not plausibly allege that ARI or any of the Entity Defendants still holds that stock.  In fact, they assert that the TCI and IOT shares are now in Ryan's possession, and that the TCI stock is ultimately owned and controlled by The May Trust and the Martin Trust.  With respect to the December 2010 transfers of ART's ownership interests in at least 15 entities, however, plaintiffs have alleged that at least some of the transfers were to EQK.  Accordingly, the court grants the Entity Defendants' motion to dismiss plaintiffs' unjust enrichment/constructive trust claim, except as to EQK.

## VII

The court turns next to plaintiffs' alter ego theory of recovery, which the parties contend is governed by Nevada or Texas law.[15]

## A

An alter ego remedy is a type of equitable relief available "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice."  *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 302 (5th Cir. 2007) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)); Nev. Rev. Stat. § 78.747 (2015).  Traditional veil-piercing uses the alter ego

---

[15]Because the laws of Texas, Nevada, and Georgia do not appear to conflict concerning the piercing the corporate veil doctrine, because neither side has thoroughly briefed the choice-of-law issue, and because both sides cite Texas and Nevada law, the court will assume *arguendo* that the law of Texas or Nevada applies to plaintiffs' alter ego claim. The court notes, however, that ART was incorporated in Georgia and that "courts have held that the law of the state of incorporation for the entity whose corporate form is at issue applies to determine whether to pierce the corporate veil." *Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 195 (S.D. Tex. 2008) (citing cases).

doctrine to break through corporate formalities and include the assets of a shareholder or other corporate insider as assets of a corporation. *See In re Moore*, 379 B.R. 284, 291 (Bankr. N.D. Tex. 2007) (discussing traditional use of corporate veil piercing to "mak[e] a *shareholder* liable for a *corporation's* contractual debts"); *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 846 (Nev. 2000) ("[T]he classic alter ego situation involves a creditor reaching the personal assets of a controlling individual to satisfy a corporation's debt[.]").  Reverse veil-piercing, which is a common law doctrine recognized in many states, including Nevada and Texas, renders the assets of a corporation liable for the debts of a corporate insider based on a showing that the corporate entity is actually the alter ego of the individual. *See Moore*, 379 B.R. at 292 (noting that reverse veil-piercing "appl[ies] the traditional veil piercing doctrine in reverse, so that a *corporation's* assets are held accountable for the liabilities of *individuals* who treated the corporation as their alter ego" (citing *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243 (5th Cir.1990))); *LFC Mktg. Grp.*, 8 P.3d at 846 ("[T]he 'reverse' piercing situation involves a creditor reaching the assets of a corporation to satisfy the debt of a corporate insider based on a showing that the corporate entity is really the alter ego of the individual.").[16]

---

[16]Plaintiffs allege that "either piercing the veil of ART or reverse piercing the corporate veil is warranted," Am. Compl. ¶ 162, and the Individual Defendants, Entity Defendants, and Unrelated Defendants argue that "the analysis is a reverse-piercing case to determine whether ART is the alter ego of each of the 27 Defendants," Indiv. Ds. Br. 14.  But plaintiffs are not seeking to treat the assets of the corporation (ART) as the assets of its corporate insiders (e.g., Gene, Donald, Mickey, Ryan, or any of the other Entity or Unrelated Defendants).  Rather, they are seeking to treat the assets of certain individuals as assets of ART, which is more akin to traditional veil piercing.

The elements for finding an alter ego are:

> (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice.

*LFC Mktg. Grp.*, 8 P.3d at 846-47 (citation omitted); *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990) (stating that "[u]nder the alter ego theory, courts disregard the corporate entity when there exists such unity between corporation and individual that the corporation ceases to be separate and when holding only the corporation liable would promote injustice."). Under Nevada law, courts consider the following nonconclusive factors as indicative of the existence of an alter ego relationship: "(1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities."[17] *LFC Mktg. Grp.*, 8 P.3d at 847. Courts "have emphasized, however, that '[t]here is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the

---

[17]Texas courts consider similar factors, including:

> (1) the payment of alleged corporate debts with personal checks or other commingling of funds, (2) representations that the individual will financially back the corporation, (3) the diversion of company profits to the individual for the individual's personal use, (4) inadequate capitalization, and (5) any other failure to keep corporate and personal assets separate.

*Dodd v. Savino*, 826 S.W.3d 275, 291 (Tex. App. 2014, no pet.).

- 23 -

circumstances of each case.'" *Id.* (quoting *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 887 (Nev. 1987)).

B

The Individual Defendants, the Entity Defendants, and the Unrelated Defendants move to dismiss plaintiffs' alter ego claim, contending that plaintiffs have not properly pleaded alter ego under the requirements of Rule 12(b)(6) or 9(b) because they have failed to identify any specific facts attributable to the Individual Defendants, the Entity Defendants, or the Unrelated Defendants. They argue that, although plaintiffs make numerous allegations about unity among all defendants and ART, they fail to identify the "who, how, where, when, and why" of the unity and inseparability as required by Rule 9(b). They posit that plaintiffs' "simple allegations of unity are nothing more than the unadorned, the-defendant-unlawfully-harmed-me accusations that are expressly prohibited by *Iqbal*, *Twombly*, Rule 12(b)(6[)] and the heightened pleading requirements of Rule 9(b)." Indiv. Ds. Br. 16; Entity Ds. Br. 13; Unrelated Ds. Br. 16.

Plaintiffs respond that defendants have ignored the "multiple layers of alter egos that exist between the Defendant Entities and individual Defendants, particularly, Gene Phillips, who is at the top of the pyramid of 'Egos.'" Ps. Indiv. Ds. Resp. Br. 15. They contend that they have detailed defendants' fraudulent conduct and have made allegations that pertain to the "unity" of interest among all the corporations and certain individual defendants. And they maintain that

- 24 -

> [t]he Alter Ego relief requested as a result of the other claims asserted by the Plaintiffs and to hold alter egos liable for ART's judgment, is limited to the Phillips' Defendants [i.e., Gene, Mickey, Donald, and Ryan] since they are the individuals that control this web of entities such that there is no distinction between them and the entities that they caused to act! Included in that chain of alter egos are other Defendants, that are owned by the Phillips and used to do their bidding.

Ps. Entity Ds. Resp. Br. 14.

## C

Plaintiffs' allegations of a "unity" of interest among Gene, Donald, Ryan, Mickey, Pillar, Prime, Prime LLC, Syntek, National Advisors,[18] RAI, The May Trust, The Martin Trust, ARI, EQK and ART consists of the following:

> A unity between the [above named defendants] is such that the separateness of Defendant ART ceased for reasons that include but are not limited to the commingling of funds, guaranties and representations made by the Defendants for the purpose of providing financial backing for ART, the diversion of ART's assets and/or profits and inadequate capitalization of ART, confusion between separate properties, records and control and failure to keep assets separate.

Am. Compl. ¶ 157.   Plaintiffs allege throughout the amended complaint that Gene had "control" over TCI, IOT, ARI, and their subsidiaries, as Judge Hale found in ART's bankruptcy proceedings. *E.g., id.* ¶¶ 133, 161.

The court concludes that plaintiffs' allegations are conclusory and insufficient to

---

[18]Although plaintiffs refer to "National Advisors," they may have intended to refer to "Realty Advisors" because plaintiffs have not named "National Advisors" as a defendant.

plausibly allege plaintiffs' alter ego claim under Rule 12(b)(6).[19]  Plaintiffs fail to plausibly allege any facts in support of their alter ego allegations.  For example, they do not specify which entities' funds were commingled or allege any facts in support of this allegation; they do not plead any details of the alleged "guarantees and representations" that defendants allegedly made (including which defendants made them) for the purpose of providing financial backing for ART; and they do not plead any facts demonstrating that defendants failed to keep ART's assets separate or that there was confusion between separate properties, records, and control.  Accordingly, because plaintiffs have not plausibly alleged that there was such unity of interest and ownership among Gene, Donald, Ryan, Mickey, Pillar, Prime, Prime LLC, Syntek, RAI, The May Trust, The Martin Trust, ARI, EQK, and ART that one is inseparable from the other, the court grants the motions of the Individual Defendants, the Unrelated Defendants, and the Entity Defendants to dismiss plaintiffs' alter ego claim.

VIII

The court now considers plaintiffs' civil RICO claim.

A

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs

---

[19]Because the court concludes that plaintiffs' allegations fail to meet the Rule 12(b)(6) standard (i.e., to state a claim on which relief can be granted), it does not now decide whether plaintiffs' alter ego allegations must also comply with the heightened pleading requirements of Rule 9(b).

through a pattern of racketeering activity[.]"   18 U.S.C. § 1962(c).   "'Reduced to their simplest terms, the essential elements of a RICO claim are: (1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'"   *Orthoflex, Inc. v. ThermoTek, Inc*., 2012 WL 2864510, at *2 (N.D. Tex. July 12, 2012) (Fitzwater, C.J.) (quoting *Larrew v. Barnes*, 2002 WL 32130462, at *1 n.1 (N.D. Tex. Aug. 27, 2002) (Kaplan, J.), *rec. adopted*, 2002 WL 32130462 (N.D. Tex. Sept. 17, 2002) (Fitzwater, J.)).

The Individual Defendants, the Unrelated Defendants, and the Entity Defendants move to dismiss plaintiffs' civil RICO claim under Rule 9(b), contending that the claim neither names the Individual Defendants, the Unrelated Defendants, or the Entity Defendants, nor alleges any acts by the Individual Defendants, the Unrelated Defendants, or the Entity Defendants that support a claim for relief.

Considering defendants' first argument, the court concludes that the amended complaint adequately names the defendants against whom plaintiffs assert their RICO claim. The complaint alleges that the RICO enterprises are The May Trust, The Martin Trust, Pillar, Prime, Prime LLC, BCM, ARI, EQK, Syntek, Realty Advisors, RAI, RAMI, ART, TCI and IOT.   Am. Compl. ¶ 175.   And it asserts that the following defendants "participated in the conduct of the enterprise(s)['] affairs": The May Trust, The Martin Trust, Pillar, Prime, Prime LLC, BCM, ARI, EQK, Syntek, Realty Advisors, RAI, RAMI, Bertcher, Moos, Corna, Gene, Ryan, and Donald.   *Id.* ¶ 176.   As to any of the Individual Defendants, the Unrelated Defendants, or the Entity Defendants who are not included in this list, the court concludes

- 27 -

that plaintiffs have not pleaded a RICO claim against them.  Accordingly, to the extent

defendants seek dismissal of the RICO claim as to the unnamed defendants, the court denies

their motion without prejudice as moot.

Defendants' second argument is that plaintiffs have not satisfied their burden under

Rule 9(b) to "allege[] any acts on the part of the [Individual Defendants, the Entity

Defendants, or the Unrelated Defendants] to support a claim for relief against them."  Indiv.

Ds. Br. 17; Entity Ds. Br. 14; Unrelated Ds. Br. 17.  The court denies defendants' motions

to the extent they are made on this ground.  In addition to other allegations in the amended

complaint, plaintiffs plead the following specific acts in support of their RICO Claim:

a.  Creating a scheme to defraud the Plaintiffs by creating false and fraudulent pretenses, transactions, loans and documents, all of which were executed in violation of law and transmitted by U.S. mail and/or wire to the Securities and Exchange Commission, attorneys and others in violation of one or more of the following statutes: 18 [U.S.C. §] 1028[,] 18 [U.S.C. §] 1341, 18 [U.S.C. §] 1343, 18 [U.S.C. §] 1348, 18 [U.S.C. §] 1350[.]

b.  Through the fraudulent concealment of assets, the intentional filing of false or incomplete forms with U.S. Bankruptcy Courts and/or the filing of false information in several states with respective bankruptcy courts[.]

c.  By fraudulently preparing and executing transactional documents to defraud the Plaintiffs and others for their own benefit, the benefit of the other Supplementary Defendants and other third parties through violations of 18 [U.S.C. §] 1028[,] 18 [U.S.C. §] 1341, 18 [U.S.C. §] 1343, 18

- 28 -

[U.S.C. §] 1348, 18 [U.S.C. §] 1350[.]

> d.      By violating the Wire Fraud Act via emails, telephone calls through transmission and dissemination of false and fraudulent information, including via U.S. Mail[.]

Am. Compl. ¶ 176. Many (if not most) of these alleged acts constitute "racketeering activity," as defined in the RICO statute.[20] The court acknowledges that the lengthy amended complaint, plaintiffs' tendency to allege that various defendants participated in the same conduct, and plaintiffs' failure to link any of defendants' conduct with a specific provision of title 18 or other defined "racketeering activity" makes it difficult to assess whether plaintiffs have adequately pleaded a RICO claim. But it is not sufficient in the context of the instant motions to dismiss for defendants to effectively shift to the court the burden of scrutinizing the amended complaint to determine whether there are deficiencies with respect to each of the 27 named defendants.[21] Accordingly, because plaintiffs have not, as defendants maintain, failed to plead "*any* acts" in support of their RICO claim, and because,

---

[20]*See* 18 U.S.C. § 1961, defining "racketeering activity" to include any act that is indictable under a list of enumerated provisions of title 18 of the United States Code.

[21]Stated another way, the burden on a party moving to dismiss under Rule 12(b)(6) or 9(b) is different from the burden borne by a party moving for summary judgment on a claim or defense for which the party will not have the burden of proof at trial. Such a summary judgment movant is only obligated to point the court to the absence of evidence of at least one essential element of the claim or defense. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Generally, a movant under Rule 12(b)(6) or 9(b) must show why the pleading being challenged is insufficient rather than simply point to the pleading and assert that it is defective. And while the court does not suggest that a motion under Rule 12(b)(6) or 9(b) that points generally to a pleading deficiency can never be sufficient, it is not adequate here given the nature and elements of the claim and the number of defendants at issue.

aside from citing a Fifth Circuit case that generally states the standard for pleading fraud, defendants have failed to point to any specific deficiency in the amended complaint with respect to plaintiffs' RICO claim, the court denies defendants' motions to dismiss the claim under Rule 9(b).[22]

## IX

The court turns finally to Transcontinental's Rule 12(b)(6) motion to dismiss. Transcontinental contends that although it was listed both in the caption of the case and as a party in the complaint, plaintiffs have eliminated it from the caption and from the "Parties" section in the amended complaint. Transcontinental requests that, because the amended complaint contains no claims against it, the court dismiss plaintiffs' claims against it in their entirety. Plaintiffs respond that they deliberately excluded Transcontinental from the amended complaint, and that Transcontinental is no longer a party-defendant.

Accordingly, because plaintiffs acknowledge that Transcontinental has been dropped as a party-defendant, the court denies Transcontinental's motion to dismiss without prejudice as moot. The clerk of court is directed to change the docket, in accordance with the usual procedure, to reflect that Transcontinental is no longer a party.

## X

"Because the court's usual practice when granting a motion to dismiss is to permit a plaintiff at least one opportunity to replead, the court will give [plaintiffs] an opportunity to

---

[22]In denying this ground of defendants' motions to dismiss, the court does not suggest that the claim can survive summary judgment or trial.

amend [their] complaint." *Shah v. Univ. of Tex. Sw. Med. Sch.*, 54 F.Supp.3d 681, 707 (N.D. Tex. 2014) (Fitzwater, C.J.) (citing *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.)). "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d at 567-68. Although plaintiffs have already amended once, they did so by agreed order, and before the court identified specific deficiencies in their pleadings. Plaintiffs are often able to state plausible claims for relief once the court identifies the defects in their pleadings and permits them to amend. *See, e.g., Reneker v. Offill*, 2010 WL 1541350, at *2, *7 (N.D. Tex. Apr. 19, 2010) (Fitzwater, C.J.) (after twice granting motions to dismiss, concluding that plaintiff's second amended complaint stated claim on which relief could be granted). Accordingly, the court grants plaintiffs leave to file a second amended complaint within 28 days of the date this memorandum opinion and order is filed.

If plaintiffs opt not to replead, they must file a notice with the clerk of court indicating that this is their intent. If plaintiffs file such a notice, defendants must file their answers within 21 days of the date the notice is filed. They need only address in their answers the claims that the court has declined to dismiss.

XI

Defendants have filed four separate motions seeking a protective order to stay discovery until 30 days following the court's decision on their motions to dismiss.

Because the court has today decided the pending motions to dismiss, all defendants' motions for protective orders to stay discovery are denied as moot to the extent they seek a stay while the court decides the motions to dismiss.

Except as to defendants Ryan, The May Trust, and The Martin Trust, the court grants the motions to the extent of staying discovery as to any moving defendant[23] for 30 days from the date of this memorandum opinion and order. The court denies the part of the April 2, 2015 motion for protective order to stay discovery that seeks relief on behalf of Ryan, The May Trust, and The Martin Trust, and it lifts the temporary stays of discovery that apply to these defendants.

The continuation of the discovery stay for 30 days, and the lifting of the temporary stays as to Ryan, The May Trust, and The Martin Trust, are subject to any discovery orders issued by Judge Stickney before or after the filing of this memorandum opinion and order. Judge Stickney is currently addressing discovery matters in this case, including matters that have included agreements of the parties. It is not the court's intention to interfere with Judge Stickney's orders unless review is sought and granted.

\*   \*   \*

For the reasons explained, the court grants in part and denies in part defendants' motions to dismiss. The court grants plaintiffs leave to file a second amended complaint

---

[23]A "moving defendant" is a defendant who joined one of the four motions referenced in § I of this memorandum opinion and order. A handful of defendants did not join any of these motions.

within 28 days of the date this memorandum opinion and order is filed.  The clerk of court is directed to change the docket, in accordance with the usual procedure, to reflect that Transcontinental is no longer a party.

Except as to defendants Ryan, The May Trust, and The Martin Trust, the court stays discovery as to any moving defendant for 30 days from the date of this memorandum opinion and order.  The court denies the part of the April 2, 2015 motion for protective order to stay discovery that seeks relief on behalf of Ryan, The May Trust, and The Martin Trust, and it lifts the temporary stay of discovery from these defendants.  The continuation of the discovery stay for 30 days, and the lifting of the temporary stays as to Ryan, The May Trust, and The Martin Trust, are subject to any discovery orders issued by Judge Stickney before or after the filing of this memorandum opinion and order.

**SO ORDERED**.

June 3, 2015.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE