## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **DAVID M. CLAPPER,** | § | |
| **ATLANTIC MIDWEST L.L.C., and** | § | |
| **ATLANTIC XIII, L.L.C** | § | |
| | § | |
| **Plaintiffs** | § | |
| **v.** | § | **CASE NO: 3:14-cv-02970-D** |
| | § | |
| **AMERICAN REALTY INVESTORS, INC.,** | § | |
| **et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' MOTION FOR LEAVE
## TO FILE THIRD AMENDED COMPLAINT

## **TABLE OF CONTENTS**

Table of Contents......................................................................................................................ii

Table of Authorities.................................................................................................................iii

FACTUAL/PROCEDURAL BACKGROUND.........................................................................1

LAW AND ARGUMENT............................................................................................................5

CONCLUSION AND RELIEF REQUESTED.........................................................................14

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases:</u>**

*Baxter v. PNC National Association,* 541 Fed. Appx. 395..............................................................1

*Berge Helene Ltd. V. GE Oil & Gas, Inc.,* 830 F. Supp. 2d 235 (S.D. Tex. 2011)...........................6

*Castleberry v. Branscum*, 721 S.W.2nd 270 (Tex. 1986)................................................................2

*Grant v. City of Houston*, 625 Fed. Appx. 670 (5th Cir. 2015)......................................................5

*HTA Med. Portfolio 2, LLC v. Bartel,*
    2015 U.S. Dist. LEXIS 143999 (N.D. Tex. Apr. 20, 2015).................................................5-6

*Jacob v. Osborne*, 133 F3d 315 (5th Cir. 1998)...............................................................................13

*LFC Marketing Group, 8*, P.3rd at 846-7........................................................................................2

*Mancorp, Inc. v. Culpepper,* 802 S.W.2nd 226 (Tex. 1990)...........................................................2

*Martin's Herend Imports, Inc. v. Diamond & Gem Trading,*
    195 F.3d 765 (5th Cir. 1999)..........................................................................................13

*Papa Berg, Inc. v. World Wrestling Entm't, Inc.,*
    2013 U.S. Dist. LEXIS 16696 (N.D. Tex. Nov. 25, 2013)....................................................5

*Polaris Industries Corp. v. Caplin*, 747 P.2nd 884 (Nevada 1987)................................................2

*Recursion Software, Inc. v. Interactive Intelligence, Inc.,*
    2010 U.S. Dist. LEXIS 113827 (N.D. Tex. Oct. 19, 2010)............................................5, 13

*S & W Enterprises, LLC v. Southtrust Bank of Alabama,*
    315 F.3d 533 (5th Cir. 2003)........................................................................................5, 13

*SEC v. Res. Dev. In'l, LLC*, 47 F.3rd 295 (Fifth Cir.).....................................................................2

*Southwestern Bell Telephone Co. v. City of El Paso*, 346 F.3d 541 (5th Cir. 2003).........................5

*Squyres v. Heico Cos., LLC,* 782 F.3d 244 (5th Cir. 2015)............................................................5

*Whitley v. Hanna,* 726 F.3d 631 (5th Cir. 2013..............................................................................5

**<u>Federal Rules:</u>**

Fed. R. Civ. P. 15(a)...........................................................................................................5, 13, 14, 16

Fed. R. Civ. P. 16(b)..................................................................................................................5, 16

## FACTUAL/PROCEDURAL BACKGROUND

Plaintiffs filed their Original Complaint in this matter on August 19, 2014 and their First Amended Complaint on December 15, 2014.  Following the Court's Order on Defendants' Motions to Dismiss, the Court granted Plaintiffs leave to file a Second Amended Complaint. Plaintiffs did so on July 1, 2015.

Plaintiffs' Original, First, and Second Amended Complaint filed in this action set forth claims of alter ego and unjust enrichment/constructive trust against Defendant ARI. ARI filed a Motion to Dismiss those claims pursuant to Rule 12(b)(6) and moved to stay discovery. The Court granted the stay of discovery and several months later dismissed Plaintiffs' claims against ARI based on alter ego and for unjust enrichment/constructive trust. In dismissing the unjust/constructive trust claim against ARI, the Court found that the Plaintiffs' Amended Complaint Plaintiffs' failed to allege that ARI had secured any benefit or obtained any assets from Plaintiffs that would be unjust to retain. Citing *Baxter v. PNC National Association,* 541 Fed. Appx. 395 at 396, the Court found that in order to establish a constructive trust, the proponent must prove actual fraud, unjust enrichment of the wrongdoer and **tracing to an identifiable res**. While the Court found that unjust enrichment/constructive trust claims were adequately stated with respect to certain December 2010 transfers of ART ownership interest in at least 15 entities to EQK, the Court found that Plaintiffs had not adequately set forth that ART received, controlled, and correctly possessed the EQK and TCI shares fraudulently transferred to ARI. Evidence has since been disclosed by Defendants which clearly shows ARI not only directly holds those shares, but that it possesses a great number of other assets fraudulently transferred from ART, including cash and other property.

1

With respect to Plaintiffs' alter ego theory of recovery, the Court stated that an alter ego remedy is a type of equitable relief available "when there is such unity between corporation and individual that the separateness of the corporation is ceased and holding only the corporation liable would result in injustice." *SEC v. Res. Dev. In'l, LLC*, 47 F.3rd 295, 302 (Fifth Cir.) quoting *Castleberry v. Branscum*, 721 S.W.2nd 270, 272 (Tex. 1986); Nevada Revised Statute Section 78.747 (2015). The Court further stated the elements for finding an alter ego are:

1) Corporation must be influenced and governed by the person asserted to be the alter ego;
2) There must be such a unity of interest in ownership that one is inseparable from the other;
3) The facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction a fraud or promote injustice.

*LFC Marketing Group, 8*, P.3rd at 846-7 (Citation omitted; *Mancorp, Inc. v. Culpepper,* 802 S.W.2nd 226, 228 (Tex. 1990) stating that "under the alter ego theory, Courts disregard the corporate entity when there is just such unity between corporation and individual that the corporation ceases to be separate when holding only the corporation liable would promote injustice."). Under Nevada law, Courts consider the following non conclusive factors as indicative of the existence of an alter ego relationship: "(1) Comingling of funds; (2) Under capitalization; (3) Unauthorized diversion of funds; (4) Treatment of corporate assets as the individual's own; and (4) Failure to observe corporate formalities." *LFC Marketing Group*, 8 P.3rd at 847. Courts "have emphasized however, that "there is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." *Id*. (Quoting *Polaris Industries Corp. v. Caplin*, 747 P.2nd 884, 887 (Nevada 1987)).

In granting Defendant ARI's Motion to Dismiss the alter ego claim, the Court found Plaintiffs failed to plausibly allege any facts in support of the alter ego allegations. The Court stated "for example, they do not specify which entities funds were comingled or alleged any facts

2

in support of this allegation; they do not plead any details of the alleged "guarantees in representations" that Defendants allegedly made (including which Defendants made them) for the purpose of providing financial backing for ART; and they do not plead any facts demonstrating the Defendants failed to keep ART's assets separate or there was confusion between separate properties, records and control. Because Plaintiffs had alleged there was such a unity of interest in ownership particularly among ARI, EQK, and ART that one is inseparable from the other, the Court granted ARI and EQK's Motion to Dismiss Plaintiffs' alter ego claim. (DE 209). The Court granted Defendants' Motion to Dismiss the unjust enrichment/constructive trust claims against ARI, but not EQK.

Thereafter, the stay was lifted and Discovery was finally able to proceed. After multiple extensions, Motions for Protective Order, and Plaintiffs' Motions to Compel, Defendants produced over 400,000 pages of documents in February 2016; but only after being sanctioned by the Court (DE 188). At every turn, Defendants obstructed discovery, including the production of documents and the scheduling of depositions.  With the Court's assistance, finally corporate representative depositions of ARI and EQK were taken.  The deposition of Defendant American Realty Investors, Inc.'s ("ARI") corporate representative, Gene Bertcher ("Mr. Bertcher") was taken on July 26, 2016.  Mr. Bertcher appeared, but was not adequately prepared for his deposition and refused to answer multiple questions, claiming, 5½ years after the fraudulent transfers that he was still working on finding answers to questions largely associated with where ART's monies and assets had disappeared to in the last 15 years (it was learned that they were taken directly by ARI in addition to the EQK/TCI stock). Plaintiffs were then forced to file a Motion for Sanctions, requesting that the Court order ARI to re-appear and the designated representative to be adequately prepared on the designated areas of inquiry ("DAIs") listed in the 30(b)(6) deposition notice

(which the Court found to be stated with "reasonable particularity.") Plaintiffs could not previously obtain the necessary facts, documents, and answers to their questions from any other source. On November 9, 2016, the Court issued an Order finding that Mr. Bertcher was not adequately prepared for his Rule 30(b)(6) deposition, determining that his was failure to respond to pertinent questions was effectively a failure to appear at all, and issued monetary sanctions.  The Court then ordered Mr. Bertcher (or other designated ARI representative) to re-appear for deposition prior to December 9, 2016 (DE 289).  **Mr. Bertcher appeared for ARI's re-noticed 30(b)(6) deposition on December 6, 2016.  The testimony provided by Mr. Bertcher on that date compelled Plaintiffs to file this Motion.**

Plaintiffs also received documents filed by ARI and TCI with the SEC in December, 2016, which showed that ARI retained controlled and continued to possess the EQK and TCI publicly traded stock that had been fraudulently transferred from ART to ARI in January, 2011 (Ex. 1, App. 1-13 2016 SEC filings).

Plaintiffs seek leave to file their Third Amended Complaint (Ex. 2, App. 14-54). Defendants would not be prejudiced by the proposed amendments (which simply add an alter ego and unjust enrichment/constructive trust claim against Defendant ARI), as they previously possessed the information that led to the proposed amendments, but just failed to produce or disclose it.  Discovery in this matter continues until April 30, 2017.  The current discovery deadline would allow Defendants adequate time to perform any necessary additional discovery to investigate the proposed added claim.

4

## <u>LAW AND ARGUMENT</u>

### GOOD CAUSE EXISTS FOR ALLOWING MODIFICATION OF THE SCHEDULING ORDER DEADLINE REGARDING AMENDMENT OF PLEADINGS

Fed R. Civ. P. 16(b) governs the amendment of pleadings when a scheduling order deadline has passed. *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 2010 U.S. Dist. LEXIS 113827 at 6 (N.D. Tex. Oct. 19, 2010), citing *S & W Enterprises, LLC v. Southtrust Bank of Alabama*, 315 F.3d 533, 536 (5th Cir. 2003). Under Rule 16(b)(4), a scheduling order deadline may be modified upon a showing of good cause and with the judge's consent. The good cause standard requires the party seeking to amend "to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *Id.* at 535. In determining good cause the court considers: (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice. *Recursion Software, supra* at 6-7 (N.D. Tex. Oct. 19, 2010), citing *Southwestern Bell Telephone Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003).

Since Rule 15(a)(2) provides that leave to amend should be granted freely as justice so requires, "[a] motion to amend ordinarily should be granted absent some justification for refusal." *Papa Berg, Inc. v. World Wrestling Entm't, Inc.*, 2013 U.S. Dist. LEXIS 16696 (N.D. Tex. Nov. 25, 2013), citing *Whitley v. Hanna,* 726 F.3d 631, 648 (5th Cir. 2013). Courts often consider whether the summary judgment motion deadline has passed when considering whether undue delay exists. If the summary judgment deadline has not passed, Courts are more likely to grant a motion for leave to amend the pleadings.[1] See *Squyres v. Heico Cos., LLC,* 782 F.3d 244 (5th Cir. 2015); *Grant v. City of Houston*, 625 Fed. Appx. 670 (5th Cir. 2015); *HTA Med. Portfolio 2, LLC*

---

[1] The summary judgment motion deadline is not until May, 2017.

*v. Bartel,* 2015 U.S. Dist. LEXIS 143999 (N.D. Tex. Apr. 20, 2015). If the parties undertook discovery on the issue in question and the opposing party does not suffer prejudice from the amendment, there may be good cause to grant plaintiff leave to amend. *Berge Helene Ltd. V. GE Oil & Gas, Inc.,* 830 F. Supp. 2d 235 (S.D. Tex. 2011).

This Court should look to the factors enumerated above and find that good cause exists to modify the scheduling order deadline with regard to amendment of pleadings.  Plaintiffs did not move to amend prior to the May 1, 2016 amendment deadline because the information necessitating amendment only came to light during Mr. Bertcher's recent December 6, 2016 deposition, and only after the Court first sanctioned ARI for failure to provide testimony as to Plaintiffs' specific areas of inquiry, including what happened to ART's assets (ART had been a NYSE publicly held company with more than $500 million in assets before it was merged into ARI in 2000 – which occurred after Plaintiffs filed their underlying lawsuit against ARI in 1999). At the December 6, 2016 deposition, compelled by the Court's Order, Mr. Bertcher for the first time provided substantial testimony that supports the claim that ARI and EQK acted as the alter ego of Defendant ART, and ARI had been unjustly enriched when it took more than $300 million in assets from ART, in Mr. Bertcher's words "leaving ART a shell," all during the pendency of the 1999 lawsuit.  Plaintiffs were unable to move to amend prior to the amendment deadline because prior to Mr. Bertcher's recent deposition, Plaintiffs were unaware of the specific facts showing that ARI and EQK had/have such a unity of interest with Defendant ART that there is no separation between ARI and EQK and Defendant ART.   Mr. Bertcher testified that Defendant ARI exercise(d) such dominion and control over Defendant ART that the corporations cease(d) to exist separate from ARI. **The testimony, considering all the prior misrepresentations in both the Bankruptcy Court and this Court, are nothing less than shocking**. The following are

multiple examples, testified by Mr. Bertcher, as the ARI designated corporate representative, in

the latest December 6, 2016 deposition, ordered by the Court as a sanction:[2]

> p. 55    A.    That's my – I wasn't here until 2008, and a lot of records have been destroyed over the years, but my understanding of how the process worked was that **ARI just stepped in and substituted for ART**.

> p. 59    A.    As I've said on numerous occasions, **there weren't any books of ART, so there weren't any accounting entries for ART**.
>
> Q.    What about for ARI? Were there any accounting entries that reflected the transfer from EQK to ARI?
>
> Q.    I'm sorry. Of EQK from ART to ARI.

> p. 60    A.    Again, there were no accounting entries for ART, **so EQK had been reflected as an ARI subsidiary** – could you say it – repeat the question? I'm sorry.
>
> A.    Or any entries – there weren't any books of ART to make the entries on.
>
> Q.    What about ARI? How did ARI reflect on its books and records that the EQK was transferred from ART to ARI?
>
> A.    It didn't.
>
> Q.    Was there any gain reflected on ART's books or loss as a result of the transfer of EQK to – from ART to ARI?
>
> A.    **ART didn't have any books**.
>
> Q.    so nothing was reflected

> p. 61    on those books?
>
> A.    That's correct.
>
> Q.    What about any tax returns? Was there any gain or loss reflected on the transfer of EQK from ART to ARI?
>
> A.    All these companies are consolidated into one tax return, so there was no gain or loss reflected for any reason on a tax return. But, again, there wasn't any books for ART, so there was nothing to reflect it on.

> p. 81    Q.    All right. Now **did ART have assets other than the 128 properties?**
>
> A.    I don't recall. Again, **we didn't keep separate accounting records**, so I don't know.

> p. 84    A.    The 159 and the 204 both would have been owed back and forth to ART back in 2000.
>
> Q.    All right. So the 159 – neither of those amounts were owed to ARI. Correct?
>
> A.    My recollection of those amounts is they were inherited amounts by ARI on the day acquired all the stock of ART. They became ARI's through the purchase of ART in – an ultimate ownership position, but they weren't generated on ARI's watch.

> p. 86    Q.    Your statement, however, as to accounting records, there is no records of money that came from ART and its subsidiaries that were paid to ARI. Is that correct?
>
> A.    When?
>
> Q.    After the merger in 2000.
>
> A.    **To the extent there were ART subsidiaries**

---

[2] The entire Bertcher December 6, 2016 deposition transcript is attached as Ex. 3, App. 55-200.

7

p. 87     **properties, money did go back and forth, but it went to ARI and not ART.**

p. 93   Q.    Which liabilities were extinguished in the ARI and ART transaction, that is, for the transfer to EQK for $140 million?

    Q.    Were there any liabilities extinguished?

    A.    No. It's one consolidated financial statement and one consolidated tax return. It's all within the package, so nothing changed for ARI and its financial records.

    Q.    Was ART relieved of some amount of liability, $148 million?

    A.    There was no books for ART, so there was no relief to record because there wasn't any place to record it.

p. 98   Q.    I'm asking if you were listing **subsidiaries of ART and their intercompany accounts**, why not include EQK, NRLP or GCLP?

    A.    **We treated them as if they were owned by ARI**, which they economically were, in our opinion I mean, ARI paid for them back in 2000, and ARI owned them, and we treated them as being owned by ARI.

    Q.    **Isn't it true that until transfer in January of 2011, that EQK – that NRLP and GClP were wholly-owned subsidiaries of EQK and EQK was a wholly-owned subsidiary of ART?**

    A.    **That may be the legal form**, but for accounting purposes, my only goal was to create a financial statement – consolidated financial statement for ARI, and it wasn't necessary for me to go through all this internal gymnastics of he gets two properties and he gets three properties and he owns two of those and back up to the parent company. For accounting

p. 99 purposes and simplicity purposes, there was no necessity to go through all that. We just go to the end place quicker.

    Q.    All right. So if the 240 million less the 159 amount that existed in 2000, 200 of that to reduce it to 41 million had been paid or advanced to ARI, why weren't the general and administrative expenses of 96 million applied against the 200 million that had been – that had moved from ART's subsidiaries to ARI?

    A.    The charges went against the properties ownership. The cash that was taken in the earlier years was – as we mentioned at my last deposition, **we clearly considered it ours at ARI, treated it as a <u>deemed dividend</u> to us.** And the cash went to us. And that's how it was handled. That's how we always handle our other properties. And we didn't do anything special for ART or these 128 properties. **That's the way we ran our company.**

    Q.    When you say "us," you mean ARI?

    A.    ARI, yes. I'm sorry, ARI. We always take – we always treat the properties as we own them.

p. 100 Q.    What was the accounting basis for taking ART's money and ARI considering it its own?

    A.    The accounting – the accounting – the business – **the business position was that we owned it.**

p. 101 **It was ours. It was essentially ours, and we took our cash.**

    Q.    **From ART subsidiaries?**

8

A.      **From everything – from ART** – in this example, from ART subsidiaries, but it's the way we treated all our other companies as well.

p. 102   A.      Our position was and is that it was a **deemed dividend**, essentially a deemed dividend through the years. There was nothing to offset because there was nothing owed.

Q.      Why didn't, if they were taking deemed dividends, why did they charge them an additional general administrative expense?

A.      Because we believed we were legally entitled to do so.

Q.      What is the basis.

A.      Again, I'm not going to get into legal positions, but we believed at the time and still do that we were entitled to that money.

Q.      And there was no effort made by ARI to see or account for the moneys it had taken from either EQK and

p. 103   its subsidiaries or ART and its subsidiaries before charging them the additional 76 and 96 million dollars. Correct?

Q.      In general administrative expenses.

A.      Correct.

Q.      Can you tell me in 2011, January of 2011 if

p. 104   ART owed any money to ARI?

A.      I had no books for ART, so I had no idea.

p. 111   Q.      All right. I'm not asking between ART and ARI how much ARI valued EQK or paid ART. I'm asking between ART and EQK, all right, two separate legal entities. **You understand that concept, that they're separate legal entities. Right?**

p. 112   A.      I do, but you understand that I testified about 3,000 times now that over the years there weren't any books on ART to record an economic event. So it wasn't recorded on ART's books because there weren't any ART's books.

p. 113   Q.      Was the intercompany account between EQK and ART adjusted to reflect this sale of 922,737 shares from ART to T -- to EQK?

A.      There were no books on records of ART to record this transaction on the ART side.

p. 123   Q.      **So what's going on here is that ARI is having ART, BCM, all the TCI stock get into EQK so that EQK then can be transferred by ART to ARI. Correct?**

A.      **Yes.**

p. 124   Q.      Now at this time, that is January 14, 2011, BCM was a wholly-owned subsidiary of EQK who was a wholly-owned subsidiary of American Realty Trust. Correct?

A.      Yes.

p. 126   A.      We were getting all of the TCI stock in one place.

Q.      And why were you doing that?

A.      For control purposes. We were doing that not only for TCI stock, but for ARI stock and the IOT stock as well. We were trying to get our arms around where all of it was and get it owned in just one or two places, and this was an opportunity to do that here.

Q.      Control by who?

9

A.      ARI – ARI or Realty Advisors, depending on

p. 127  which stock you're talking about.

p. 196  Q.      Isn't it true that the 159 came into being before ARI was created and before ARI became the parent of these entities?

A.      Yes.

p. 232  A.      To the extent that I had documents that were not provided, by books and records would still not reflect an ART intercompany because I don't have any ART books and records. The only way ART books and records could be – would have to be created because they don't exist in a normal accounting system of my company.

Q.      **How would we find out what the intercompany account balances were between ART and EQK or ART and ARI or EQK and ARI at the end of 2010?**

A.      **I cannot** – I don't have any information on any ART intercompany. It's having to be recreated. It doesn't exist.

p. 233  Q.      So there's no record of the intercompany account balances between ART and ARI?

A.      Not that exist in my accounting system every day.

p. 237  Q.      **Well, don't you think you should have figured out whether ARI owed ART money or its wholly-owned subsidiary EQK or ART owed ARI money before ARI took the EQK stock?**

p. 238  A.      **With respect to ART, I don't believe it was necessary**. I don't believe the $159 million matters because I believe that as the parent company with no other obligations in sight and all other bills being paid, the **parent company (ARI) deposited the money in its bank account, took it as a – what I call the deemed distribution and moved on**. And whether there was 159 million on the books or whether the intercompany said this, that or the other thing, **whatever cash was available went to pay – went to ARI and ARI kept it**.

A.      So the intercompany balances that rolled forward from 2000 I believe are irrelevant.

p. 245  Q.      **Do you know what a dividend is from an accounting standpoint?**

A.      **This was <u>not</u> a formally declared dividend authorized by the board of directors with the paperwork that would accompany a formal dividend, which is why I refer to it as a deemed dividend. It has the exact same effect of a dividend without having all the formality.**

p. 248  A.      The moneys that were provided for the parent through the years, the parent owed them. It's parent's assets. **Parent took the money. ARI**, that was come and gone.

p. 249  A.      As I said, once we treated the cash we received as a dividend, it was our money, our money being ARI. And it was nothing to offset and no need to offset.

p. 259  A.      My testimony is if the sale occurred after the merger, I believe the money by the process would have gone to ARI.

p. 260  Q.      When 2.7 of it was an ART receivable before the merger. That is, ARI didn't take that cash, It just took credit for ART's receivable?

A.      ART's balance sheet disappeared into ARI's balance sheet upon the merger. They were both in account 920. So ARI's balance sheet became – ART's balance sheet became merged and immersed in ARI's balance sheet as the new parent.

10

Q.      **So ARI basically took all of ART's assets?**

A.      To the extent that a liability was paid after the merger and ART didn't have a bank account, it was – it was paid by ARI.

p. 262  A.      **In 2011 ART had been reduced to just a shell** in 2011. There was no January of 2011. The judgment was, I think, October, was it not, of '11? By then ART was a shell and worth $10 million, and that's what we sold it for.

Q.      And ARI made it into a shell by taking its valuable assets EQK, TCI from it, correct in 2011?

A.      ARI took the money that it was entitled to take, that it was owed. It was a creditor just like other people. And it took its 138 million that it thought it was entitled to and I believe appropriately.

p. 263  Q.      But in doing so, it left ART a shell. Correct?

Q.      **As a result of those transfers that ARI conducted, it left ART a shell. Correct?**

A.      **That may have been the result, but if ARI hadn't taken the money, ART would have had more money, but ARI was owed the money. It was entitled to money. And it took it. Paid itself.**

p. 264  Q.      Well, it was left a shell. That was your testimony.

A.      Well, I used the word shell. It was worth $10 million to us when we sold it.

Q.      Well, but you never collected the 10 million and you've written it off as uncollectible on your books and what's reported to the SEC. Correct?

A.      Yes.

p. 266  A.      I don't remember when in – firstly, I don't remember when. It could have been January 1, 2010, when this event occurred, but the cash went to the only bank account available which was ARI, which is the policy that they had and instilled for years and years

p. 267  and years for all their property. So ARI did what ARI does with all of its properties.

p. 284  Q.      GCLP at the end of 2010 was a wholly-owned subsidiary of EQK and EQK was a wholly-owned subsidiary of American Realty Trust?

A.      I don't recall where it was. For accounting

p. 285  **we just treat it all as ARI's honestly**. So I don't – that's a part of the exercise we're going through. **We never cleaned this up over the years**. It eliminated so everybody – there was a debit in one account. There was a credit in the other. Nobody's ever cleaned up the bookkeeping.

A.      Whether it should still be there or not, I don't know.

p. 289  A.      We treated this for accounting as everybody owed ARI, so it eliminated so everybody moved on. We didn't focus on GLP being a sub of EQK, who was a sub of ART, who was a sub of this guy, who is a sub of ARI. **We just treated everybody as being ARI or we eliminated it**. **It was a shortcut, but it got all the books closed very quickly**. And I have to go – I don't remember the facts and circumstances of the 218 million, but it is not on D162.

p. 292  Q.      **You're not aware of any formal written documents** on the part of GCLP forgiving anything that ARI may have owed it, are you?

A.      No. **The ART balances were ignored from the first day ART disappeared (in 2000), ART balances. ART disappeared and ARI moved in, and off they went.**

11

p. 296  Q.      Well the – EQK in this instance remained a separate legal entity. Correct?
        A.      Yes. EQK is a separate legal entity.
        Q.      And ART is a separate legal entity. Correct?
        A.      Yes.
        Q.      So do you know of any formal documentation where the obligation, $105,826,454 that EQK owed ART that ART ever forgave that?
        A.      **I haven't seen a formal document, no**.
p. 297  Q.      Are you aware of any accounting entries where – including this one – where that's shown as ART having forgiven that 7 from EQK?
        A.      No. **That account's pretty much been ignored for ten years**.

It is important that this Court allow the requested amendment because ARI and EQK, its now wholly owned subsidiary, have significant assets (including the TCI stock) that were fraudulently transferred, and taken from ART without consideration (the so-called "deemed dividend.") Since the fraudulent transfers in January, 2011, and earlier, ART was left with no discernible assets. ARI, in Mr. Bertcher's own words, caused by ART to become a "shell." Plaintiffs should be able to pursue ARI and/or EQK's assets in order to satisfy the judgment against ART in the underlying case now that Plaintiffs have become aware of specific facts that ARI is the alter ego of ART.   This factor weighs in favor of allowing the amendment.

The proposed amendment to the Complaint will not prejudice Defendants.  There is already an alter ego claim pending against Defendant Gene Phillips in this matter.  The amendment merely adds two of the already-named Defendants to the alter ego claim.  This is not an entirely new claim that Defendants would be forced to defend against, and in fact appeared in Plaintiffs original Complaint, which the Court dismissed after Defendants argued there was no factual detail to support the claims – factual detail those same Defendants intentionally withheld from Plaintiffs (and this Court), <u>both</u> in this case and the prior dismissed bankruptcy case.[3] It would be patently unfair to allow Defendants to benefit from their own malfeasance, and previously sanctioned

---

[3] Again, the Bankruptcy Court noted in its opinion, that at least in part, ART's failure to disclose facts about the transferred assets and inter-company accounts, and cooperate in discovery, caused the Court to dismiss ART's bankruptcy case as a bad faith filing. (Ex. 4, App. 201-218).

conduct, which delayed Plaintiffs' ability to obtain specific facts to support its claims.  Defendants would be entitled to file an answer to the Third Amended Complaint.  Additionally, discovery in this matter is still ongoing, which would allow Defendants to investigate these claims prior to the close of discovery.  This factor weighs in favor of allowing the amendment.

Finally, a continuance of the amendment deadline could cure any prejudice that would result from an extension of the deadline, as an extension would allow Defendants to engage in discovery and file an answer in response.   Discovery is currently ongoing in this matter.  This factor weighs in favor of allowing the amendment.

## ONCE GOOD CAUSE HAS BEEN DEMONSTRATED, LEAVE TO AMEND SHALL BE FREELY GIVEN WHEN JUSTICE SO REQUIRES

Once the moving party demonstrates good cause to modify the scheduling order deadline, then the more liberal standard of Fed. R. Civ. P. 15(a) applies to the decision granting or denying leave to amend. *S & W Enterprises, supra*. Pursuant to Rule 15(a)(2), leave to amend "shall be freely given when justice so requires."  In the absence of bad faith, undue delay, or dilatory motive on the part of the movant, or undue prejudice to the opposing party, a court should grant leave to file an amended pleading. *Recursion Software, supra* at 7, citing *Martin's Herend Imports, Inc. v. Diamond & Gem Trading*, 195 F.3d 765, 770 (5th Cir. 1999).

The rule clearly states that leave to amend should be freely given when justice so requires. Leave to amend should be given unless there is a "substantial reason" not to do so.  The Fifth Circuit has identified the following as substantial reasons not to allow amendment: (1) undue delay; (2) prejudice to the non-movant; (3) bad faith or dilatory motives; (4) futility; and/or (5) should have been resolved by prior attempts to amend.  *Jacob v. Osborne*, 133 F3d 315, 318 (5th Cir. 1998).

13

Here, there was no undue delay.  Plaintiffs only recently became aware of the specific facts supporting the unity of interest between ARI and ART, and ARI's continued possession and control of the transferred ART assets.  Plaintiffs filed this Motion as soon as practicable following the disclosure of the unity of interest by Mr. Bertcher in December, 2016.  There would be no prejudice to the non-movant if amendment was allowed, as the Defendants would be entitled to file an answer to the Third Amended Complaint, and further, discovery in this matter is ongoing until April 30, 2017. Summary Judgment Motion deadline is not until May, 2017.  Plaintiffs do not seek leave to amend in bad faith or as the result of dilatory motives; in fact, **it is the bad faith, unfair and dilatory conduct of Defendants in discovery which is wholly responsible for the delay in Plaintiffs acquiring the specific information to file the Amended Complaint, and unjust enrichment and alter-ego claims set forth therein**.  The proposed amendment would not be futile, as it is a valid claim that could be pursued against ARI and EQK, which was revealed by the recent deposition testimony of Mr. Bertcher.

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, good cause exists to allow Plaintiffs to file a Third Amended Complaint in this matter.  Pursuant to Rule 15(a)(2), leave to amend should be freely given, because justice so requires.  Accordingly, leave to amend should be granted.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court GRANT Plaintiffs' Motion for Leave to File Third Amended Complaint and enter an Order to that effect.

Respectfully submitted,

SICILIANO MYCHALOWYCH AND VAN DUSEN, PLC

By:     /s/ Andrew W. Mychalowych
        Andrew W. Mychalowych (P39602)
        Cora L. Morgan (P59104)
        Attorneys for Plaintiffs
        40950 Woodward Ave., Ste. 350
        Bloomfield Hills, MI 48304
        (248) 442-0510/(248) 442-0518

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DAVID M. CLAPPER,** | § | |
| **ATLANTIC MIDWEST L.L.C., and** | § | |
| **ATLANTIC XIII, L.L.C** | § | |
| | § | |
| **Plaintiffs** | § | |
| **v.** | § | **CASE NO: 3:14-cv-02970-D** |
| | § | |
| **AMERICAN REALTY INVESTORS, INC.,** | § | |
| **et al.,** | § | |
| | § | |
| **Defendants.** | § | |

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

Plaintiffs hereby incorporate the facts, law, and argument stated in their Motion for Leave to File Third Amended Complaint by reference as though fully set forth herein and ask that this Honorable Court grant the relief requested as provided by Fed. R. Civ. P. 16(b)(4) and Fed. R. Civ. P. 15(a)(2).

Plaintiffs respectfully request that this Honorable Court GRANT Plaintiffs' Motion for Leave to File Third Amended Complaint and enter an Order to that effect.

Respectfully submitted,

SICILIANO MYCHALOWYCH AND VAN DUSEN, PLC

By:     /s/ Andrew W. Mychalowych
        Andrew W. Mychalowych (P39602)
        Cora L. Morgan (P59104)
        Attorneys for Plaintiffs
        40950 Woodward Ave., Ste. 350
        Bloomfield Hills, MI 48304
        (248) 442-0510/(248) 442-0518

16

## CERTIFICATE OF CONFERENCE

I hereby certify that concurrence requesting the relief sought in PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT was requested via email from Defendants' Counsel on January 12, 2017.  Defendants' Counsel did not respond nor concur with the relief sought in the foregoing motion.

/s/ Andrew W. Mychalowych

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 12, 2017, she caused the foregoing document to be filed using the electronic case files system of the court, which will provide notification of this filing to all attorneys of this case who are registered ECF users.

/s/ Madelynn Pokrzywinski

17