IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DAVID M. CLAPPER, Individually, §
et al., §
§
Plaintiffs, §
§ Civil Action No. 3:14-CV-2970-D
VS. §
§
AMERICAN REALTY INVESTORS, §
INC., et al., §
§
Defendants. §

MEMORANDUM OPINION
AND ORDER

This is an action by plaintiffs David M. Clapper ("Clapper"), Atlantic Midwest, LLC

("Atlantic Midwest"), and Atlantic XIII, LLC ("Atlantic XIII") against defendants American

Realty Trust, Inc. ("ART"), American Realty Investors, Inc. ("ARI"), EQK Holdings, Inc.

("EQK"), and Gene Phillips ("Phillips") seeking to collect a multi-million judgment based

on state-law claims for fraudulent transfer, unjust enrichment/constructive trust, and alter

ego. After dismissing the case for lack of subject matter jurisdiction, the court determined

that it would exercise supplemental jurisdiction under 28 U.S.C. § 1367(a). *See Clapper v.*

*Am. Realty Inv'rs, Inc.,* 2018 WL 2739014, at *1 (N.D. Tex. June 6, 2018) (Fitzwater, J.)

("*Clapper VI*"). The court now addresses several pending motions in the case.

I

Because this case is the subject of several prior memorandum opinions and orders, *see*

*e.g., Clapper VI,* the court will recount only the background facts and procedural history that

are pertinent to this decision.

A

In 1999 ART and ART Midwest, Inc. ("ART Midwest") sued Clapper, Atlantic Midwest, and Atlantic XIII.[1] Following extensive litigation before Judge Buchmeyer and an appeal to the Fifth Circuit, the case was reassigned to Judge Godbey.

After Judge Godbey granted summary judgment partially in favor of Clapper, Atlantic Midwest, and Atlantic XIII (awarding damages totaling over $17 million), the case was tried to a jury ("January 2011 Trial"). After the jury returned a verdict in favor of Clapper, Atlantic Midwest, and Atlantic XIII, Judge Godbey filed a Rule 54(b) final judgment awarding more than $73 million in damages against ART and ART Midwest.

Clapper, Atlantic Midwest, and Atlantic XIII then filed various post-judgment motions to aid in collecting the judgment. Before the motions were decided, however, ART and ART Midwest jointly filed for bankruptcy.[2] It was during these bankruptcy proceedings and on further investigation that Clapper, Atlantic Midwest, and Atlantic XIII learned of the transfers among ARI, ART, and EQK (sometimes referred to collectively as the "Entity

---

[1]Because both sides move for summary judgment, the court will recount the evidence that is undisputed, and, when it is necessary to set out evidence that is contested, will do so favorably to the side who is the summary judgment nonmovant in the context of that evidence. *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

[2]Although ART and ART Midwest initially filed for bankruptcy elsewhere, ART's bankruptcy (ART Midwest's was dismissed) was transferred to the United States Bankruptcy Court for the Northern District of Texas in September 2013, and assigned to Judge Hale.

Defendants") that it now alleges are fraudulent.

B

In August 2000 ART and one of its 55%-owned subsidiaries, National Realty, L.P. ("NRLP"), merged with ARI. At the time of the merger, ART owned shares in several publicly traded companies, including NRLP, Transcontinental Realty Investors, Inc. ("TCI") and Income Opportunity Realty Investors, Inc., as well as 128 single purpose entities that held ART's real estate assets ("SPEs"). Under the 2000 merger, ART and NRLP shareholders exchanged their shares for shares of ARI, and ART became a wholly-owned subsidiary of ARI while NRLP became a wholly-owned subsidiary of ART. ARI became the parent of the consolidated group of companies.

Following the merger, EQK, a successor company of NRLP, became a wholly-owned subsidiary of ART in 2002. EQK also owned stock in various SPEs that, in turn, each owned a real estate asset. During the decade following the merger, the EQK and ART SPEs sold their real estate assets and deposited the proceeds in the ARI bank account. During this time, ART's financials were consolidated with ARI's financials.

Plaintiffs and defendants have different positions concerning the details of these transactions. Plaintiffs maintain that, from 1999 though 2011, during the pendency of the litigation before Judge Godbey, ARI took a total of $260 million in "deemed dividends"—$199 million of ART's assets[3] and at least $61 million of EQKs assets—for no

---

[3]Plaintiffs maintain that, in 1999, ART subsidiaries had a total of at least $241,548,290 in assets, and that, by 2011, their assets totaled $42,543,787.00.

consideration.[4] ARI also posits that, on the eve of the trial beginning on January 24, 2011, ARI stripped ART of the remainder of its assets by charging EQK and ART for the 2000 merger transaction and for subsequent overhead expenses.

Defendants maintain that transfers from ART and EQK SPEs to ARI did not result in a net benefit to ARI. They contend that ART did not maintain a separate bank account because ART's finances were consolidated with ARI's. Defendants posit that each SPE still kept its own books, records, and bank accounts, but the relationships among these entities explains why proceeds of the sales by the SPEs were deposited in the ARI bank account.

## C

During the bankruptcy proceedings, plaintiffs learned that, on January 14, 2011, ART transferred all of its 922,737 shares of TCI stock to its wholly-owned subsidiary, EQK, for an alleged $5,988.563.13 credit on a debt allegedly owed by ART to EQK. On January 14, 2011 Basic Capital Management, Inc. ("BCM"), then a wholly-owned subsidiary of EQK, transferred to EQK as a "dividend" 920,507 shares of TCI stock that it held. One week later, ART transferred EQK to ART's then-parent, ARI. This interest consisted of 922,737 TCI shares and 920,507 TCI shares held by BCM, a wholly-owned subsidiary of EQK. ARI then transferred its ownership of ART to another affiliated entity, OneRealco, for $10 million in the form of financing provided by ARI, with a five-year note receivable at 3% interest. In July 2014 the TCI stock held by EQK was transferred directly to ARI, allegedly for

---

[4]Plaintiffs allege that, although many of these transfers commenced earlier, they were not completed until following the jury trial that began on January 24, 2011.

insufficient consideration.

Plaintiffs and defendants have very different accounts of the nature of these transactions. Plaintiffs' claims all center on the theory that defendants transferred assets among the Entity Defendants to evade payment of the final judgment against ART entered by Judge Godbey in 2016. Plaintiffs maintain that the sale price of ART to OneRealco ($10 million) is not payable or collectible; that the transfers of TCI shares and the transfer of EQK to ARI occurred for little or no consideration; that these transfers benefited ARI[5] and EQK by allowing ART to file for bankruptcy to delay creditors from collecting its assets; that the transfers benefited Phillips,[6] a local real estate investor who, although not an officer or director of any of the Entity Defendants, exercises a substantial amount of control over the Entity Defendants via operating company, Pillar Income Asset Management ("Pillar")[7]; and that Pillar is owned by Realty Advisors, LLC ("Realty Advisors"), which is owned by the Phillips family through the May Trust.

Defendants advocate a different view of the transactions. Defendants maintain that the 2011 transfers were part of a reorganization to simplify the administration of defendant entities. They posit that, at the time of the transfer of EQK to ARI, ART owed ARI $101,448,265.00 for administrative, corporate, and advisory fees paid by ARI from August

_____

[5]Plaintiffs posit that ARI is an alter ego of ART, BCM, and EQK.

[6]Plaintiffs maintain that Phillips is an alter ego of ART, ARI, and EQK.

[7]Prior to April 2011, Pillar's predecessor was one of the Prime entities, which was owned by Realty Advisors, LLC, which, in turn, was owned by the May Trust.

2000 through December 2010.[8] ART also owed ARI an additional $65,111,445.00.[9] In addition to these expenses and other intercompany liabilities, defendants contend that ART owed ARI a total of $476.3 million at the time of EQK's transfer. Defendants also maintain that, at the time of transfer, EQK had a negative value.[10] Defendants thus argue that ART received adequate consideration for the transfer of EQK because it received forgiveness of antecedent debt in the amount of $476.3 million and shed itself of a negatively valued asset.[11]

D

In August 2014 Clapper, Atlantic Midwest, and Atlantic XIII filed this suit alleging claims for fraudulent conveyance, in violation of the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code Ann. § 24.001 *et seq.* (West 2018) ("TUFTA"), unjust enrichment/constructive trust, alter ego, civil conspiracy to commit fraudulent conveyances,

---

[8]Defendants maintain that ARI paid advisory and management expenses to Pillar, Prime, and BCM, but these expenses were not itemized or apportioned until January 2011.

[9]Defendants do not explain the origin of the $65 million charge, but the court infers that this charge is the same as that referred to elsewhere—the $65 million debt owed by ART to ARI relating to the 2000 merger. Defendants maintain that ART was indebted to ARI for its acquisition of 45% of the NRLP stock prior to the merger of ART with ARI.

[10]Defendants are inconsistent about the value of EQK at the time of transfer. ART states that, at the time of transfer, EQK was an "asset with a negative value of $70 million." ART. 8/31/2017 Br. 12. But defendants' retained expert, Dr. Scott Hakala, determined that, as of January 15, 2011, EQK had a net asset value of negative $30.8 million.

[11]Plaintiffs maintain that the Board of Directors proposal for the January 14, 2011 transfer of EQK stipulated that ARI would purchase 100% of the common stock of EQK from ART for a total purchase price of $141,700,000. ARI would pay this amount by reducing by approximately $131,700,000 an intercompany debt owed by ART to ARI and by transferring 10,000 shares of EQK preferred stock to ART. Plaintiffs aver that defendants changed the alleged consideration for the transaction several times.

and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Following several rounds of motions to dismiss and amended complaints, in December 2017 the court had under consideration various pending motions, including those addressed today. As part of the decisional process, the court reviewed the operative complaint at the time: plaintiffs' third amended complaint. In doing so, it noted that plaintiffs predicated subject matter jurisdiction on diversity of citizenship, 28 U.S.C. § 1332, but it concluded that the third amended complaint failed to allege properly the citizenship of plaintiffs Clapper, Atlantic XIII, and Atlantic Midwest, and defendants Prime Income Asset Management, LLC, and Phillips. Because diversity jurisdiction was then the sole basis for the court's subject matter jurisdiction, the court ordered plaintiffs to amend their complaint to properly plead the citizenship of the parties specified in the order. In response, plaintiffs filed the instant fourth amended complaint ("fourth complaint").

After plaintiffs filed the fourth complaint, defendants moved to dismiss the case for lack of subject matter jurisdiction. In *Clapper v. American Realty Investors, Inc.*, 2018 WL 1083609 (N.D. Tex. Feb. 28, 2018) (Fitzwater, J.) ("*Clapper V*"),[12] the court granted defendants' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter

---

[12]In *Clapper VI* the court referred to its February 28, 2018 *Clapper V* opinion as "*Clapper IV*" because it chose not to include in the numbering scheme *Clapper v. American Realty Investors, Inc.*, 2017 WL 978098, at *1 (N.D. Tex. Mar. 14, 2017) (Fitzwater, J.) ("*Clapper IV*"), an opinion that addressed plaintiffs' motion for leave to file a third amended complaint. In today's memorandum opinion and order, the court is including *Clapper IV* and referring to its February 28, 2018 opinion as *Clapper V*.

jurisdiction,[13] but granted plaintiffs leave to move for any available relief that would enable the court to exercise subject matter jurisdiction. *Id.* at *6. In response, plaintiffs moved for leave to file a fifth amended complaint, or, alternatively, to remove plaintiffs Atlantic XIII and Atlantic Midwest as parties in their fifth amended complaint under Rule 21.

In *Clapper VI* the court concluded in its discretion that it should exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over the remaining state-law claims in this lawsuit. It denied plaintiffs' motion for leave to file a fifth amended complaint and their motion to remove the Atlantic entities from the lawsuit. *Id.* at *1. Because the court had statistically closed all pending motions that had been filed as of the date the case was dismissed, the court also permitted the parties to request that a motion be statistically reopened. *Id.* at *4. On July 6, 2018 the court reopened the motions that the parties requested be reopened, and they are now before the court for decision.[14]

_____

[13]No federal claims remained in the case because the court dismissed the only federal claim—a claim under RICO, 18 U.S.C. § 1962—in *Clapper v. American Realty Investors, Inc.*, 2016 WL 302313 (N.D. Tex. Jan. 25, 2016) (Fitzwater, J.). Nor could the court exercise diversity jurisdiction. The court concluded that, because a nonparty limited partnership—ART Midwest L.P. ("ART Midwest"), not Atlantic Midwest—was the real party to the controversy, the court was required to look to the citizenship of ART Midwest when determining whether the parties were diverse citizens. The court held that the Georgia citizenship of two members of ART Midwest—Atlantic XIII and ART—destroyed diversity because ART was also a defendant in the lawsuit.

[14]The motions addressed in this memorandum opinion and order are as follows: ARI, ART, EQK, and Phillips' April 21, 2017 motion to dismiss; ART's April 21, 2017 motion to dismiss; Phillips' April 21, 2017 motion to dismiss; EQK's April 21, 2017 motion to dismiss; ARI's April 21, 2017 motion to dismiss; Phillips' March 28, 2017 motion for summary judgment; plaintiffs' August 31, 2017 motion for partial summary judgment; ART's August 31, 2017 motion for summary judgment; ARI's August 31, 2017 motion for

In the operative fourth complaint, plaintiffs allege a claim for fraudulent conveyance, in violation of TUFTA, against the Entity Defendants; a claim for unjust enrichment/constructive trust against EQK and ARI; a claim for alter ego against ARI; and a claim for alter ego against Phillips.

In five separate motions,[15] the following defendants, individually or in these combinations, move to dismiss the fourth complaint under Rules 9(b) and 12(b)(6): (1) ARI, ART, EQK, and Phillips; (2) ART; (3) Phillips; (4) EQK; and (5) ARI. Defendants collectively move to dismiss the fourth complaint in its entirety, or, alternatively, to strike the parts they contend are not compliant with the court's order granting plaintiffs leave to plead an alter ego claim against ARI. Each defendant moves to dismiss all claims against it.

_____

summary judgment; EQK's August 31, 2017 motion for summary judgment; plaintiffs' June 15, 2017 motion for leave to file supplemental appendices to plaintiffs' response to Phillips' motion for summary judgment; plaintiffs' July 28, 2017 motion for leave to supplement the record as to plaintiffs' response to Phillips' motion for summary judgment; ARI, ART, EQK, and Phillips' September 21, 2017 motion to strike plaintiffs' motion for summary judgment brief and appendix; ARI, ART, EQK, and Phillips' October 4, 2017 first motion for leave to file supplements to defendants' response to plaintiffs' motion for partial summary judgment; plaintiffs' October 18, 2017 motion for leave to file appendix in support of plaintiffs' reply in support of their motion for partial summary judgment; plaintiffs' October 31, 2017 motion for leave to file supplemental appendix in support of plaintiffs' motion for partial summary judgment; ARI, ART, and EQK's January 16, 2018 motion to strike fourth amended complaint; Phillips' January 16, 2018 motion to strike fourth amended complaint; and Phillips' July 18, 2018 motion to stay.

[15]Although the parties filed the relevant motions when the third amended complaint was the operative complaint, the fourth complaint (which plaintiffs filed to correct their allegations of diversity jurisdiction) contains the same allegations as the third amended complaint. Rather than direct the parties to file new briefing, the court will decide the pending motions based on the briefing on file.

Plaintiffs oppose the motions. In four separate motions, each of the following defendants individually moves for summary judgment on all claims against him or it: Phillips, ART, ARI, and EQK. Plaintiffs oppose the motions and cross-move for partial summary judgment on their fraudulent conveyance and unjust enrichment claims, their alter ego claim against ARI, and their affirmative defenses. Defendants oppose the motion.

## II

Before turning to the merits of the parties' motions, the court sets out the Rule 12(b)(6), Rule 9(b), and summary judgment standards that govern the disposition of the motions.

## A

Under Rule 12(b)(6), the court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin F. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). To survive a motion to dismiss, plaintiffs must allege enough facts "to state a claim of relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough

to raise a right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)).  Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than "'labels and conclusions.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  And "'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

B

"Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud."  *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)), *aff'd*, 514 Fed. Appx. 513 (5th Cir. 2013).[16]  "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *Id.* (quoting *Benchmark Elecs.*, 343 F.3d at 724) (internal quotation marks omitted).  More colloquially, plaintiffs must plead the "who, what, when, where, and how" of the fraud.  *Williams v. Bell*

---

[16]"[S]tate-law fraud claims are subject to the pleading requirements of Rule 9(b)." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir. 2008) (citations omitted).

*Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

Because Rule 9(b) must be "read in conjunction with [Rule] 8 which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," "punctilious pleading detail" is not required. *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, J.) (quoting *Landry v. Air Lines Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990)) (internal quotation marks omitted). "The court's key concern in assessing a complaint under Rule 9(b) is to determine whether the plaintiff seeks to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *4 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.) (quoting *FDIC v. Gaubert*, No. 3-90-1196-D, slip op. at 7 (N.D. Tex. Sept. 4, 1990) (Fitzwater, J.)).

C

Each movant's summary judgment burden depends on whether the movant is moving for relief on a claim or defense for which he or it will have the burden of proof at trial. Defendants move for summary judgment on claims for which plaintiffs will have the burden of proof at trial. Because plaintiffs will have the burden of proof, defendants' burden at the summary judgment stage is to point the court to the absence of evidence of any essential element of plaintiffs' claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once they do so, plaintiffs must go beyond their pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*,

37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in plaintiffs' favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiffs' failure to produce proof as to any essential element of the claim renders all other facts immaterial. *TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where plaintiffs fail to meet this burden.[17] *Little*, 37 F.3d at 1077.

To be entitled, however, to summary judgment on a claim for which the movant will have the burden of proof at trial, the moving party "must establish 'beyond peradventure all of the essential elements of the claim[.]'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). Plaintiffs must meet this burden as to the claims they assert, because they will have the burden of proof at trial on these claims. This means that plaintiffs must demonstrate that there are no genuine and material fact disputes and that they are entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmy. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marin Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

---

[17]These standards also apply when plaintiffs move for summary judgment on defendants' affirmative defenses, for which defendants will have the burden of proof at trial.

III

The court first considers all defendants' motion to dismiss the third/fourth complaint.[18] Defendants maintain that the court granted plaintiffs leave only to amend their complaint to add an alter ego claim against ARI. They contend that because plaintiffs pleaded numerous additional claims, they violated an order of the court. Thus they ask the court to dismiss the entire third amended complaint or strike the non-compliant portions pursuant to Rule 41(b).[19]

Defendants point to ¶ 111(p) of the complaint,[20] which they view as improperly expanding plaintiffs' fraudulent transfers allegation by a minimum of 218 transfers. Defendants also detail a series of other factual additions that they assert are not related to the alter ego claim that plaintiffs had leave to assert against ARI. The court disagrees with defendants because it concludes that these factual allegations support plaintiffs' alter ego claim against ARI.

For example, certain allegations pertain to fraudulent transfers to ARI: "Since 2000, ART's cash and interest in properties and at least 218 subsidiaries were taken by ARI, and deposited in ARI's own bank account, without any accounting, documentation, or formal

---

[18]Defendants' motion to dismiss is addressed to allegations of the third amended complaint that are also included in the fourth complaint. The court includes the updated citations to the fourth complaint and includes footnotes indicating the original paragraphs to which defendants' motion was addressed.

[19]Defendants also seek an award of sanctions. This request is denied.

[20]3d. Am. Compl. ¶ 119(p).

approval by either ART's or ARI's Board of Directors[.]" 4th. Am. Compl. ¶ 111(p).[21] And

the other factual additions to which defendants object, illustrated by the following selections,

relate to the corporate form and business of ARI:

> [i]n filings with the SEC, *ARI and TCI submitted false and untrue documentation regarding transfers of their shares* that were in furtherance of the conspiracy to defraud ART's creditors and which were intended to aid and abet the fraudulent conveyances of the EQK and TCI stock. *ARI and TCI further participated in the conspiracy by modifying their books and records to reflect the fraudulent transfers of the stock described herein.*

4th. Am. Compl. ¶ 123 (emphasis added).[22] "Defendant ARI continues to hold title in the

assets fraudulently transferred to it pursuant to the transactions described in Paragraph [101],

[102], and [111] above, and assets taken and not paid for from EQK and its subsidiaries,

when EQK was a wholly owned subsidiary of ART." 4th. Am. Compl. ¶ 117.[23] Thus the

court holds that these factual allegations do not extend beyond the scope of the court's order.

Defendants also object to plaintiffs' addition of "the cash and assets transferred or

taken by ARI and EQK from ART and its subsidiaries since 2000" to the assets over which

they request a constructive trust. 4th. Am. Compl. ¶ 151.[24] Because the court is dismissing

the unjust enrichment/constructive trust claim on a ground it is raising *sua sponte, see infra*

---

[21]3d. Am. Compl. ¶ 119(p).

[22]3d. Am. Compl. ¶ 131.

[23]3d. Am. Compl. ¶ 125.

[24]3d. Am. Compl. ¶ 159.

§ VII, the court will not address this argument.

Finally, defendants contend that plaintiffs do not have leave of the court to specifically allege that ARI acted as the alter ego of ART and EQK. They maintain that plaintiffs moved for leave to allege that ARI is the alter ego of ART only, and they request that the court strike EQK from Count III of the third amended complaint.

Plaintiffs primarily based their motion on newly-discovered evidence of fraudulent transfers between ART and ARI. But they also stated that "ARI and EQK, its now wholly owned subsidiary, have significant assets . . . that were fraudulently transferred, and taken from ART without consideration." Ps. Mot. Leave to File 3d Am. Compl. at 12. Thus defendants had notice that an alter ego allegation against ARI could involve EQK in some capacity. Furthermore, the court's order granted plaintiffs "leave to amend to the extent they seek leave to add an alter ego claim against ARI, and supporting factual allegations." *Clapper v. Am. Realty Inv'rs, Inc.*, 2017 WL 978098, at *5 (N.D. Tex. Mar. 14, 2017) (Fitzwater, J.) ("*Clapper IV*"). The court did not confine plaintiffs to pleading only a claim based on the theory proffered in their motion. Accordingly, the court denies defendants' request to strike EQK from Count III.

The court denies defendants' collective motion to dismiss the third/fourth complaint.[25]

---

[25]The court also denies defendants' motion to strike plaintiffs' fourth amended complaint pursuant to Rule 41 and Phillips' motion to strike plaintiffs' fourth amended complaint, which incorporate the same arguments as defendants' collective motion to dismiss the third amended complaint.

IV

The court next considers plaintiffs' fraudulent transfer claim against ART, ARI and EQK.

A

To establish a claim under TUFTA, a plaintiff must prove that (1)[it] is a "creditor" with a claim against a "debtor"; (2) the debtor transferred assets after, or a short time before, the plaintiff's claim arose; and (3) the debtor made the transfer with the intent to hinder, delay, or defraud the plaintiff. *Dontos v. Vendomation NZ Ltd.*, 582 Fed. Appx. 338, 344 (5th Cir. 2014) (per curiam) (citing *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 203-05 (Tex. App. 2013, pet. denied)).

The debtor's intent can be established by showing either actual or constructive fraud. *Dontos*, 582 Fed. Appx. at 344. "[A]ctual fraud requires an actual intent to hinder, delay, or defraud any creditor of the debtor[.]" *Id.* (citing *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 437 (5th Cir. 2013)) (internal citation and quotation marks omitted). In determining actual intent, the court may consider, among other factors, the following:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the

amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com. Code Ann. § 24.005 (West 2018).  This list is neither exhaustive nor exclusive.  *See Janvey v. Dillon Gage, Inc. of Dall.*, 856 F.3d 377, 390 (5th Cir. 2017).

In the alternative, a plaintiff may show constructive fraud by

demonstrating that a debtor made the transfer or incurred an obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation," and either (1) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small," or (2) "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*Dontos*, 582 Fed. Appx. at 344 (quoting Tex. Bus. & Com. Code § 24.005(a)(2)).

TUFTA allows recovery against the debtor, the transferee, or the person for whose benefit the transfer was made.  *See* Tex. Bus. & Com. Code Ann. §§ 24.008, 24.009; *Mack v. Newton*, 737 F.2d 1343, 1361 (5th Cir. 1984) (addressing TUFTA's predecessor, the Uniform Fraudulent Conveyance Act, and noting that the statute "does not provide for recovery other than recovery of the property transferred or its value from one who is, directly or indirectly, a transferee or recipient thereof.").

B

The court first addresses defendants' separate motions to dismiss plaintiffs' fraudulent transfer claims.

1

The Entity Defendants (ART, ARI, and EQK) maintain that plaintiffs' allegations of a fraudulent transfer claim based on the transfer of real property in Texas, Florida, and Tennessee fail to meet the heightened pleading standards of Rule 9(b).

It is an open question in the Fifth Circuit whether Rule 9(b) applies to the pleading of a fraudulent transfer claim. *See AAB Logistics, Inc. v. Forward Air, Inc.*, 2016 WL 8672773, at *10 (N.D. Tex. Nov. 18, 2016) (Fish, J.) (citing *Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011)).[26] Several courts in this circuit, however, including members of this court, have stated that "where plaintiffs seek to establish the actual intent of the debtor, the enhanced pleading requirements of Rule 9(b) should apply." *Baker v. Great N. Energy, Inc.*, 2015 WL 11120878, at *3 (N.D. Tex. June 18, 2015) (Boyle, J.) (citing *Vision Bank v. Jordan*, 2012 WL 716097, at *3 (N.D. Tex. Mar. 5, 2012) (Boyle, J.)); *see also In re: Brown Med. Ctr., Inc.*, 552 B.R. 165, 168 (S.D. Tex. 2016) (applying Rule 9(b) to fraudulent transfer claim based on actual fraudulent intent); *E. Poultry Distributors, Inc. v. Yarto Puez*, 2001 WL 34664163, at *2 (N.D. Tex. Dec. 3, 2001) (Lynn, J.) ("If the fraudulent transfer statute Plaintiffs want the Court to apply requires intent to defraud, the enhanced pleading

---

[26]Plaintiffs do not dispute that Rule 9(b) applies to their fraudulent transfer claim.

requirements of Rule 9(b) apply; if the statute allows for fraudulent transfer without intent to defraud, however, only the general pleading rules of Rule 8(a) must be satisfied.").

Plaintiffs' fourth complaint alleges:

> Judgment Debtor ART owned real property in Texas, Florida and Tennessee. After the Judgment was entered against ART, the Judgment Creditors caused liens to be filed against the real properties that were owned by ART as indicated in the 2011 Annual Report of ARI filed with the SEC, with the Register of Deeds for Dallas County, Texas, Marion County, Florida and Davidson County, Tennessee. Notwithstanding the liens, ARI, ART, EQK and Gene Phillips caused the real properties to be fraudulently transferred to avoid, hinder, and otherwise prevent Judgment Creditors from enforcing their lien.

4th. Am. Compl. ¶¶ 50-52. The fourth complaint also alleges: "Since 2000, ART's cash and interest in properties and at least 218 subsidiaries were taken by ARI, and deposited in ARI's own bank account, without any accounting documentation, or formal approval by either ART's or ARI's Board of Directors." *Id.* at ¶ 111.

Such allegations of defendants' intent are insufficient to survive defendants' motion to dismiss. If plaintiffs rely on *constructive* fraudulent intent, their allegations do not satisfy Rule 8 because plaintiffs do not allege facts that allow the court to draw the reasonable inference that defendants acted with constructive fraudulent intent: e.g., that the transfer of property occurred "without receiving a reasonably equivalent value in exchange for the transfer or obligation." If plaintiffs rely on *actual* fraudulent intent, their allegations fail to satisfy Rule 9(b)'s heightened pleading requirements. At the very least, plaintiffs fail to allege when the properties were transferred, the specific entities that transferred the

properties, to whom they were transferred, and how they were transferred.[27] *Cf. Oakwood Shores Prop. Owners Ass'n, Inc. v. NTP Timber Plus + Fund I, L.P.*, 2016 WL 4494438, at *4 (S.D. Tex. Aug. 26, 2016) ( "The plaintiff's allegations also provide details concerning the parties involved and their relationships, the approximate dates of the relevant chain of events, and the locations of the real property involved in this dispute."); *Baker*, 2015 WL 11120878, at *5 (holding Rule 9(b) satisfied where plaintiffs pleaded the transferor and transferee involved, the exact dates of the fraud, and the particular assets transferred).[28] The court thus dismisses plaintiffs' fraudulent transfer claim to the extent it is based on transfers of the properties in Texas, Florida, and Tennessee and the transfers since 2000 of assets in 218 of ART's subsidiaries.[29]

2

ART and EQK also move to dismiss the fraudulent transfer claim to the extent it is based on "$105 million in cash or assets" held by EQK. 4th Am. Comp. ¶ 116. Plaintiffs allege "[d]efendant EQK continues to hold title in the assets fraudulently transferred to it

---

[27]Plaintiffs maintain that they did not plead these facts because ARI refused to answer questions at its deposition. The court, however, may not consider such evidence at the motion to dismiss stage. *Lopez-Santiago v. Coconut Thai Grill*, 2014 WL 840052, at *3 n. 4 (N.D. Tex. Mar. 4, 2014) (Fitzwater, C. J.) ("Considering such evidence would require that the court convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment.").

[28]In their motions for summary judgment, ARI and ART maintain that plaintiffs' TUFTA claim for unidentified transfers since 2000 is barred by TUFTA's statute of repose. The court does not address this argument because it is dismissing the claim under Rule 9(b).

[29]The court is not dismissing these allegations to the extent they support an alter ego claim against ARI.

pursuant to the transactions described in Paragraph 111 above, and assets taken from ART, including $105 million in cash or assets." *Id.* ART and EQK maintain that such allegations do not meet the heightened requirements of Rule 9(b) because they do not identify facts such as when the assets were transferred. ART and EQK also posit that the allegations do not satisfy Rule 8 because they fail to allege fraudulent intent.

The court agrees insofar as "$105 million in cash or assets" held by EQK refers to cash and assets not covered in ¶ 111. ART and EQK do not dispute that ¶¶ 111-115 allege facts that satisfy both Rule 9(b)'s requirements and Rule 8's requirements regarding the transfers listed in ¶ 111. Accordingly, the court dismisses the fraudulent transfer claim to the extent it is based on $105 million in cash or assets held by EQK, and to the extent such cash and assets refer to those not pleaded in ¶ 111.

3

The Entity Defendants contend that plaintiffs' fraudulent transfer claim should be dismissed because the alleged transfers were made by entities that are not defined as debtors under TUFTA. The Entity Defendants point to the alleged transfer of 920,507 shares of TCI stock from BCM to EQK on January 14, 2011, 4th Am. Compl. ¶ 45; the alleged transfer of IOT stock from EQK to ARI in 2014, *id.* at ¶ 106; the alleged transfer of ART from ARI to OneRealco, *id.* at ¶ 109; the alleged transfer of real property from ART Collection, Inc. to Fenton Real Estate, Inc. ("Fenton Real Estate"), *id.* at ¶ 111; the alleged transfer of real property from ART Palm, LLC to Fenton Real Estate, *id.*; the alleged transfer of cash and assets from ART's subsidiaries to ARI and EQK since 2000, *id.*; and the assets allegedly

"taken and not paid for from EQK and its subsidiaries, *id.* at ¶ 117.[30]  The court disagrees.

A debtor under TUFTA is defined as "a person who is liable on a claim."  Tex. Bus. & Com. Code Ann. § 24.002 (West 2018).  Here, the parties do not dispute that ART is liable to plaintiffs for the $73 million final judgment entered against it.  Plaintiffs have alleged that ART's subsidiaries and the SPEs held real estate and other assets belonging to ART.  Plaintiffs have also pleaded potential alter ego relationships among the defendants.  These allegations collectively allow the court to draw the reasonable inference that ART, or the entity or person who manipulated ART's corporate form for personal gain, fraudulently transferred its own property, held within the SPEs and other subsidiaries, to evade the judgment.  *See In re Ritz*, 567 B.R. 715, 727 (Bankr. S.D. Tex. 2017) (imposing TUFTA liability where debtor transferred $1,161,279.90 out of company he financially controlled and into the accounts of other entities that debtor controlled).  Accordingly, the court declines to dismiss plaintiffs' TUFTA claim on this basis.[31]

4

EQK maintains that plaintiffs' claim that ART fraudulently transferred TCI stock to EQK in January 2011 fails because EQK no longer possesses any of the disputed assets.  EQK posits that certain allegations make clear that any fraudulently transferred TCI and IOT

---

[30]Defendants also point to the alleged transfer of cash and property from ART's subsidiaries since 2000.  Because the court has already dismissed this claim under Rule 9(b), it will not address this argument.

[31]The court also denies the Entity Defendants' motions for summary judgment to the extent they rely on the same argument.

stock was subsequently transferred to ARI in 2014. The court disagrees.

EQK relies on the court's prior dismissal of plaintiffs' fraudulent transfer claims with respect to BCM, the May Trust, the Martin Trust, and Phillips. *Clapper v. Am. Realty Inv'rs, Inc.*, 2016 WL 302313, at *12 (N.D. Tex. Jan. 25, 2016) (Fitzwater, J.) ("*Clapper III*"). Plaintiffs' allegations against these entities—that they were "recipients in the chain of title of assets that were fraudulently transferred"—are distinguishable, however, from the allegations against EQK. *Id.* In *Clapper III* "plaintiffs fail[e]d to allege *any facts demonstrating that the assets were directly transferred to*, and are currently in the possession of BCM, the May Trust, the Martin Trust, or [Phillips]." *Id.* (emphasis added). With regard to EQK, plaintiffs allege: "EQK was a recipient of ART's fraudulently transferred assets, including real property, stock in subsidiaries, and TCI and IOT stock. Based on information and belief, EQK still holds these fraudulently transferred assets today." 4th Am. Compl. ¶ 105. Assuming *arguendo* that a TUFTA claim requires that a defendant currently possess fraudulently transferred assets,[32] the court concludes, as it did in *Clapper III*, that plaintiffs

---

[32]Defendants cite no legal authority to support this proposition. Indeed, TUFTA provides:

> the creditor may recover judgment for the value of the asset transferred, as adjusted under Subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against: (1) the first transferee of the asset or the person for whose benefit the transfer was made; or (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

have plausibly alleged that EQK has ownership interests in at least some of ART's allegedly fraudulently transferred assets.[33]  *Clapper III*, 2016 WL 302313, at *13 n.18.

5

ART also moves to dismiss certain allegations based on plaintiffs' failure to join the transferees of the assets as parties in the lawsuit.[34]  These transferees include OneRealco, 4th Am. Compl. ¶ 109, as well as First Equity Properties ("First Equity"), ART Westwood FL, Inc. ("ART Westwood FL"), and Fenton Real Estate, *id.* at ¶ 111.  The court disagrees with ART's position.

Rule 19 seeks to ensure that lawsuits are disposed of fairly and completely. *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1308 (5th Cir. 1986) (citing Rule 19 Advisory Committee's note).  To this end, the Rule establishes a two-part process to identify persons who are needed for just adjudication of the action.  First, it provides that certain persons are required to be joined as parties, if feasible.  These include persons who are subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction if "in that person's absence, the court cannot afford complete relief among existing parties."  Rule 19(a)(1).  This is a "highly practical, fact-based decision."  *Pulitzer-Polster*, 784 F.2d at

---

Tex. Bus. & Com. Code Ann. § 24.009 (West 2018).

[33]The court also denies EQK's motion for summary judgment on plaintiffs' fraudulent transfer claims to the extent it relies on the same argument.

[34]Although ART does not specify under which rule it moves to dismiss these allegations, the court treats ART as having moved under Rule 12(b)(7) to dismiss these allegations for failure to comply with Rule 19.

1309.  Second, if joinder is not feasible, the court must decide whether that person is indispensable.  Considering certain non-exhaustive factors, the court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Rule 19(b).

Aside from a single citation to *Looney v. Simpson*, 26 S.W. 1065, 1065 (1894), ART provides no argument that these parties are necessary parties that must be joined under Rule 19.  The court thus declines to dismiss plaintiffs' fraudulent transfer claim to the extent it relies on transfers to OneRealco, First Equity, ART Westwood FL, and Fenton Real Estate.

Accordingly, the court grants in part and denies in part defendants' motion to dismiss plaintiffs' fraudulent transfer claim.[35]

V

The court now turns to the summary judgment motions by the parties on plaintiffs' fraudulent transfer claim.

A

ARI and ART maintain that the 2011 transfers of TCI and EQK stock and plaintiffs' TUFTA claims for unidentified transfers since 2000 are barred by TUFTA's statute of repose.

The TUFTA statute of repose states:

---

[35]Because the court has not dismissed the entirety of plaintiffs' fraudulent transfer claim, the court denies defendants' motion to dismiss plaintiffs' requests for punitive damages, and attorney's fees on the basis that plaintiffs' fraudulent transfer claim fails as a matter of law.

Except as provided by Subsection (b) of this section, a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought: (1) under Section 24.005(a)(1) of this code, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant; (2) under Section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or the obligation was incurred; or (3) under Section 24.006(b) of this code, within one year after the transfer was made.

Tex. Bus. & Com. Code Ann. § 24.010 (West 2018). Unlike a statute of limitations, a statute of repose does not only "procedurally bar an untimely claim, it substantively 'extinguishes' the cause of action." *Nathan v. Whittington*, 408 S.W.3d 870, 874 (Tex. 2013). "A statute of repose provides an absolute affirmative defense, and the defendant bears the burden of proving all factual requisites to the statute's application." *Salgado v. Great Dane Trailers*, 2012 WL 401484, at *3 (S.D. Tex. Feb. 6, 2012) (citing *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996)) (holding that defendant bore burden of statute of repose defense at summary judgment); *Hagan v. Mazda Motor Co. of Am., Inc.*, 690 Fed. Appx. 242, 243 (5th Cir. 2017) (per curiam) ("Under Texas law, a defendant moving for summary judgment on an affirmative defense must irrefutably establish its elements.").

The court has already dismissed plaintiffs' fraudulent transfer claim based on "unidentified transfers since the year 2000" as insufficient under Rules 8 and 9(b). Regarding the transfers of TCI and EQK stock in 2011, plaintiffs clarify that they bring their claims under § 24.005(a) and § 24.006(a), both of which are subject to a statute of repose of four years. Given that this lawsuit was filed in August 2014, and the transactions occurred

in January 2011, their claims under §24.005(a) and §24.006(a) are not extinguished by the statute of repose.

To the extent plaintiffs bring their claim under § 24.006(b), they maintain that their cause of action did not accrue until they discovered at Bertcher's July 22, 2013 deposition that the January 2011 transfers were fraudulent. The TUFTA statute of repose provides that plaintiffs may bring a fraudulent transfer claim under § 24.005(a)(1) within one year after the transfer or obligation was or could reasonably have been discovered by the claimant. But plaintiffs offer no legal authority justifying the application of the discovery rule to claims brought under § 24.006(b).[36] The court declines to read a discovery rule into the TUFTA statute of repose where it clearly states that claims "under Section 24.006(b) of this code, [must be brought] within one year after the transfer *was made*."[37]

Accordingly, the court grants defendants' motion for summary judgment and dismisses plaintiffs' fraudulent transfer claim to the extent plaintiffs bring the claim under

---

[36]Plaintiffs cite *Janvey v. Romero*, 817 F.3d 184, 188 (5th Cir. 2016), and *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185, 188 (5th Cir. 2013). These opinions make clear, however, that "a claim *under section 24.005(a)(1) of TUFTA* has been held to accrue only when the claimant discovers or reasonably could have discovered the fraudulent nature of the conveyance." *Democratic Senatorial Campaign Comm.*, 712 F.3d at 195 (emphasis added).

[37]Plaintiffs refer to a bankruptcy court order, signed by Judge Hale on January 21, 2014, in which the parties agreed that "[t]he Bankruptcy Statute of Limitations, 11 U.S.C. §546(a)(1)(A), shall be extended for the period of six months, and shall expire March 1, 2015, for any claim or cause of action for which the applicable statute of limitations has not already expired as of the entry of this Order[.]" P. 8/31/2017 App. 2317. But this order pertained to the bankruptcy statute of limitations only, and plaintiffs offer no explanation of how this order relates to the TUFTA statute of repose under § 24.010.

§ 24.006(b) based on the transfers of TCI and EQK stock in 2011.[38]

B

ARI and ART maintain that, because EQK was transferred from ART to ARI for antecedent debt and adequate consideration, plaintiffs cannot show the debtor intent element on a theory of constructive fraud. ART contends that it received forgiveness of more than $250 million in debt owed to ARI[39] as well as the ability to rid itself of EQK, an asset that ART maintains was worth between negative $30 to $70 million at the time of transfer. Defendants posit that, at the time of the EQK transfer, ART owed ARI $101,448.265.00 in administrative, corporate, and advisory fees paid by ARI on ART's behalf, as well as $65,111,445.00 from the intercompany account.[40]

"Reasonably equivalent value includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." Tex. Bus. & Com. Code Ann. § 24.004 (West 2018) (internal quotation

[38]The court thus denies plaintiffs' motion for summary judgment on defendants' statute of repose affirmative defense to the extent it is based on claims under § 24.006(b).

[39]ART maintains that ARI paid the fees and expenses on behalf of its subsidiary from August 2000 until EQK common stock was transferred to ARI on January 21, 2011. ART does not explain the breakdown of the $250 million debt it states in its briefing.

[40]Plaintiffs produce Gene Bertcher's deposition in which he refers to a $105 million EQK receivable owed by EQK to ART. Plaintiffs maintain that this receivable was concealed during bankruptcy proceedings. To the extent this receivable relates to the alleged $105 million in cash or assets held by EQK, the court has dismissed some of these fraudulent transfer claims as addressed *supra* in § VI(B)(2). To the extent the claims remain, neither party explains how the EQK $105 million receivable relates to the analysis of fraudulent transfers from ART and EQK to ARI.

marks omitted). "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied[.]" *Id.*

Plaintiffs have produced evidence of various corporate practices by defendants that collectively permit the reasonable finding that defendants created ART's debt to ARI to cover a potentially fraudulent transfer. First, Gene Bertcher ("Bertcher"), ARI's designated Rule 30(b)(6) representative[41] and the Vice President and Chief Financial Officer of Pillar, testified in his deposition that while defendants represented to the bankruptcy court that ART owed ARI $138 million at the time of the EQK and TCI stock transfers, this number was $41 million too high due to a mischaracterization of an ART receivable. Moreover, Thomas Frazee ("Frazee"), plaintiffs' retained expert, in a report authored December 30, 2016 related to defendants' accounting records,[42] was unable to locate in ART's accounting system any records of the $65 million owed by ART to ARI for the 2000 merger or the additional

---

[41]A Rule 30(b)(6) representative represents the corporation at a Rule 30(b)(6) deposition. "In a Rule 30(b)(6) deposition, there is no distinction between the corporate representative and the corporation." *Hyde v. Stanley Tools*, 107 F.Supp.2d 992, 992 (E.D. La. 2000), *aff'd*, 31 Fed. Appx. 151 (5th Cir. 2001). "The Rule 30(b)(6) designee does not give his personal opinion. Rather, he presents the corporation's 'position' on the topic." *Id.*

[42]Defendants object to Frazee's expert reports on the basis that he is not an expert because his affidavit does not include his qualifications. The court has reviewed his qualifications and finds that his education and experience are sufficient to allow him to offer expert testimony. Defendants also object to plaintiffs' SEC filings, ARI's articles of incorporation, and certain mischaracterized testimony. To the extent the court has relied on evidence to which defendants object, the objections have been considered on the merits and are overruled. As to evidence to which an objection has been made but on which the court has not relied for any purpose in deciding defendants' motion for summary judgment, the objections are overruled as moot.

expenses attributed to ART.[43]  Indeed, Frazee's expert report states that, if ART's accrued

liability for overhead charges to ARI did in fact exist, accounting principles dictated that the

$260 million in "deemed dividends" paid by ART and EQK to ARI should have been netted

against this liability.  Bertcher testified that he was unaware of any written agreement in

which any of ARI's subsidiaries agreed that ARI would pay its administrative expenses.  Nor

does any Board meeting minute or corporate resolution support the existence of such debt.

ART contends that evidence of the intercompany debt is not recorded anywhere in the

company books because ARI filed consolidated financial statements with the SEC.  As such,

ART and other ARI subsidiaries were not required to create separate financial statements to

remain in accordance with GAAP.  Even so, the court agrees with the bankruptcy court that

"surely this debt would have been evidenced somewhere in the Debtor's or its affiliate's

records[.]"  And here, as in the bankruptcy court proceeding, ART has pointed to no evidence

of the existence of such debt.  Thus the court declines to grant summary judgment on the

grounds that plaintiffs have failed to produce evidence that the sale of EQK occurred for

inadequate consideration.[44]

---

[43]Plaintiffs move for leave to file a supplemental appendix in support of their motion
for partial summary judgment.  Plaintiffs also move for leave to file an appendix in support
of their reply in support of their motion for partial summary judgment.  They request that the
court permit them to file the appendix they previously submitted to the court on October 5,
2017.  Because the appendices do not change the outcome of any of the claims, both of
plaintiffs' motions for leave are granted.

[44]Even assuming *arguendo* that ART has established that EQK was transferred to ARI
for adequate consideration, this fact does not defeat plaintiffs' fraudulent transfer claims.
While it forecloses a showing of constructive fraudulent intent, the summary judgment record

C

ART next contends that the transfers of TCI stock from ART to EQK cannot be fraudulent because transfers from a parent to a solvent, wholly-owned subsidiary can never be fraudulent. The court disagrees.

> While a transfer to a wholly-owned solvent subsidiary is often for reasonably equivalent value, because the value of the parent's stock interest in the subsidiary may be correspondingly increased, that is not the case when the subsidiary is hopelessly insolvent, because the value of those shares is zero both before and after the transfer.

*In re First City Bancorporation of Tex., Inc.*, 1995 WL 710912, at *11 n.9 (Bankr. N.D. Tex. May 15, 1995). In this case, ART and plaintiffs agree that, at the time of the transfer of TCI stock from ART to EQK in January 2011, EQK had a negative value.[45] Because plaintiffs have presented evidence that EQK was insolvent at the time of transfer, a reasonable jury could find, as under the reasoning of *In re First City Bancorporation of Texas*, that such a transfer could not have occurred for reasonably equivalent value. The court thus declines to dismiss plaintiffs' TUFTA claims on this basis.

---

permits the reasonable finding that ART exhibited actual intent to defraud plaintiffs. Adequate consideration is merely one suggested factor for evaluating actual fraud. Here, plaintiffs have produced evidence of several indicia of fraud: the sale of EQK by ART, a wholly-owned subsidiary, was to an insider—its parent, ARI; the transfer of EQK occurred in January 2011, when the threat of judgment against ART loomed large; and ART was insolvent following the payment of deemed dividends to ARI.

[45]ART states that, the time of transfer, EQK was an "asset with a negative value of $70 million." ART. 8/31/17 Br. 12. Defendants' retained expert, Dr. Scott Hakala, determined that, as of January 15, 2011, EQK had a net asset value of negative $30.8 million.

D

ART and EQK also argue that the TCI shares transferred from ART to EQK in January 2011[46] and those transferred from BCM to EQK[47] were subject to a valid lien. Thus, pursuant to Tex. Bus. & Com. Code § 24.005, they could not constitute an "asset" that could be fraudulently transferred. Plaintiffs respond that the evidence defendants have provided to establish valid liens on TCI shares is an unauthenticated table showing various third parties' claims to the shares.

TUFTA defines a transfer under the second element as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset[.]" Tex. Bus. & Com. Code Ann. § 24.002 (West 2018). An "asset" includes "property of the debtor," but excludes "property to the extent it is encumbered by a valid lien." *Id.* A "valid lien" is "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." *Id*.

Assuming *arguendo* that the table of liens on TCI stock constitutes competent summary judgment evidence,[48] it does not defeat plaintiffs' fraudulent transfer claim as to

---

[46]Plaintiffs allege that on the eve of the January 2011 trial between ART and plaintiffs, "ART fraudulently transferred its directly owned TCI stock to its then wholly owned subsidiary, Defendant EQK." 4th. Am. Compl. ¶ 41.

[47]Plaintiffs allege that, on January 14, 2011, "BCM, which was a then wholly owned subsidiary of Defendant EQK (a wholly owned subsidiary of ART) transferred 920,507 shares of TCI stock to Defendant EQK as a so-called 'dividend'." 4th. Am. Compl. ¶ 45.

[48]Unauthenticated documents do not constitute competent summary judgment evidence. *See Quibodeaux v. Nautilus Ins. Co.*, 655 Fed. Appx. 984, 987 (5th Cir. 2016) (citing *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994)) (holding "the document is

the TCI shares alleged in the fourth complaint. ART and EQK have produced evidence that certain of BCM's and ARI's TCI shares are encumbered by valid liens. But they fail to show that such encumbered shares are not "assets," because it presents no evidence that they are worth less than the liens on them. *See Oakwood Shores Prop. Owners Ass'n, Inc. v. NTP Timber Plus + Fund I, L.P.*, 2016 WL 4494438, at *4 (S.D. Tex. Aug. 26, 2016) ("[encumbered property] is an asset to the extent it is worth more than the lien").

The court thus declines to grant ART and EQK's motions for summary judgment on this ground.

E

ART also contends that plaintiffs have not established that they are entitled to damages and injunctive relief. ART posits that, were the court to enter judgment against defendants in this case, it would subject them to impermissible double recovery for the claim in the case originally before Judge Godbey. The court disagrees.

Tex. Bus. & Com. Code Ann. § 24.008 provides a list of remedies available to a creditor in a fraudulent transfer action. These remedies include, *inter alia*, "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim," and "[a]ny other relief the circumstances may require." Tex. Bus. & Com. Code Ann. § 24.009 also provides that "the creditor may recover judgment for the value of the asset transferred, as adjusted under Subsection (c) of this section, or the amount necessary to satisfy the creditor's claim,

---

unauthenticated and thus is improper as summary judgment evidence.").

whichever is less."

In their fourth complaint, plaintiffs request that the court set aside the allegedly fraudulent transactions and turn over the transferred assets. Plaintiffs also request "all other damages, including punitive damages, pre-judgment interest, costs, fees and all other relief the court deems just under the circumstances." 4th Am. Compl. at 20 (prayer). These requests for relief are either directly authorized under TUFTA or are within the broad equitable discretion that TUFTA grants this court. The court thus declines to grant summary judgment to defendants on the basis that plaintiffs are not entitled to damages or injunctive relief under TUFTA.

Moreover, because there is a genuine and material factual dispute concerning the merits of plaintiffs' TUFTA claim, the court declines to hold that a reasonable jury could not find that plaintiffs are entitled to punitive damages.[49] The court therefore declines to dismiss plaintiffs' TUFTA claim on this ground.

F

ARI maintains that the Entity Defendants did not transfer IOT stock to ARI at any point during the time period alleged in the fourth complaint. Plaintiffs do not address any of ARI's arguments concerning the fraudulent transfer of IOT stock. Although plaintiffs' failure to respond does not permit the court to enter a "default" summary judgment on this claim, *see, e.g., Tutton v. Garland Independent School District*, 733 F. Supp. 1113, 1117

---

[49]Presumably, a request for attorney's fees would be presented to the court by post-judgment motion.

(N.D. Tex. 1990) (Fitzwater, J.), "[a] summary judgment nonmovant who does not respond to the motion is relegated to her unsworn pleadings, which do not constitute summary judgment evidence," *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (Fitzwater, J.) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)).  Moreover,

> [i]f a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

Rule 56(e)(2)-(3).

Plaintiffs have not designated specific facts that would enable a reasonable jury to find in their favor on a fraudulent transfer claim based on the transfer of IOT stock.  The court thus grants ARI's motion for summary judgment and dismisses the fraudulent transfer claim to the extent it relies on the transfer of IOT stock.

G

Plaintiffs move for summary judgment on their fraudulent transfer claim under three provisions of TUFTA.  First, they seek recovery under Tex. Bus. & Com. Code § 24.005(a)(1), which provides:

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

They also seek recover under Tex. Bus. & Com. Code § 24.006(a), which states:

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Plaintiffs also ask that the court grant summary judgment based on Tex. Bus. & Com. Code § 24.006(b), which provides:

> [a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Because genuine issues of material fact remain regarding the allegedly fraudulent transfers,[50] the court holds that plaintiffs have not carried their heavy burden of establishing that they are entitled to judgment on their TUFTA claim beyond peradventure, and the court denies plaintiffs' motion for partial summary judgment addressed to this claim.[51]

---

[50]"When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact." *Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 812 n.8 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.)).

[51]Because the court is denying plaintiffs' motion for partial summary judgment, the court denies as moot defendants' motion for leave to add certain attachments to certain exhibits inadvertently omitted and motion for leave to supplement expert report in support of defendants' response in opposition to plaintiffs' motion for partial summary judgment with an attached notice of changes to the motion for leave pursuant to the supplemental expert declaration and supplemental expert report of Gary B. Goolsby.

## VI

The court now turns to the fraudulent transfer claim against Phillips.

Defendants, collectively, and Phillips, individually, move to dismiss the fraudulent transfer claim against Phillips. Defendants contend that although plaintiffs omit Phillips from the heading, they include certain allegations and a request for judgment against him under the fraudulent transfer claim section of the fourth complaint. *See* 4th Am. Compl. ¶ 141 (requesting that the court "grant a judgment against the Defendant(s) to whom the asset was transferred, i.e. . . . . Gene Phillips"). In *Clapper IV* the court denied plaintiffs leave to replead their TUFTA claim against Phillips. *See Clapper IV*, 2017 WL 978098, at *3. Plaintiffs emphasize in their response that they are not asserting a TUFTA claim against Phillips and that they included factual allegations regarding fraudulent transfers to Phillips as support the alter ego claim only. Accordingly, the court grants the motion to dismiss this claim to the extent that it purports to plead a fraudulent transfer claim against Phillips.

## VII

The court now turns to plaintiffs' unjust enrichment claim. ARI and EQK maintain that plaintiffs' unjust enrichment claim fails because their TUFTA claim fails and because it is barred by the statute of limitations. ARI separately moves for dismissal on the ground that it did not receive an unjust benefit from plaintiffs. The court need not reach these arguments.

The court can raise a ground for summary judgment *sua sponte*, provided it affords the opposing party notice and a fair opportunity to respond. *See, e.g., Nunn v. State Farm*

*Mut. Auto. Ins. Co.*, 729 F.Supp.2d 801, 810 (N.D. Tex. 2010) (Fitzwater, C.J.) (citing *Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *9 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.)). The court has previously held that Texas law does not recognize an independent cause of action for unjust enrichment. See *Hancock v. Chi. Title Ins. Co.*, 635 F.Supp.2d 539, 560 (N.D. Tex. 2009) (Fitzwater, C.J.) (dismissing unjust enrichment claim at summary judgment stage); *see also Redwood Resort Props., LLC v. Holmes Co.*, 2006 WL 3531422, at *9 (N.D. Tex. Nov. 27, 2006) (Fitzwater, J.) (dismissing unjust enrichment claim at motion to dismiss stage and holding that it is not an independent cause of action). "Moreover, Texas courts of appeals have consistently held that unjust enrichment is not an independent cause of action, but is instead a theory upon which an action for restitution may rest." *Hancock*, 635 F.Supp.2d at 560 (citing *Argyle Indep. Sch. Dist. v. Wolf*, 234 S.W.3d 229, 246-47 (Tex. App. 2007, no pet.); *Friberg-Cooper Water Supply Corp. v. Elledge*, 197 S.W.3d 826, 831-32 (Tex. App. 2006, pet. granted), *rev'd on other grounds*, 240 S.W.3d 869 (Tex. 2007); *Mowbray v. Avery*, 76 S.W.3d 663, 680 (Tex. App. 2002, pet. denied)). In *Hancock* this court explained:

> [i]t is true . . . that the Supreme Court of Texas and other courts still occasionally refer to an "unjust enrichment claim." These opinions do not, however, characterize unjust enrichment as a separate cause of action from money had and received; they consider it to be a general theory of recovery for an equitable action seeking restitution. . . . Plaintiffs have cited no cases in which the Supreme Court of Texas has recognized a claim for unjust enrichment as independent from an action for money had and received, and the court concludes Texas law indicates that they are not separate and independent claims.

*Id.* at 560-61 (citations omitted).

Accordingly, the court raises *sua sponte* that ARI and EQK are entitled to summary judgment dismissing plaintiffs' unjust enrichment claim,[52] and it denies plaintiffs' motion for summary judgment on their constructive trust/unjust enrichment claim. The court grants plaintiffs 21 days from the date this memorandum opinion and order is filed to file an opposition response, brief, and appendix that addresses the ground on which the court has raised summary judgment *sua sponte*.

## VIII

The court now turns plaintiffs' claim that ARI is an alter ego of ART and EQK.[53]

---

[52]Because the court is granting summary judgment in favor of ARI and EQK on this claim, the court denies as moot ARI's and EQK's motions to dismiss this claim.

[53]ARI moves under Rule 12(b)(6) to dismiss plaintiffs' alter ego claim, contending, *inter alia*, that plaintiffs have not sufficiently pleaded: (1) that ARI controlled EQK because ARI did not govern exclusively, (2) that ARI commingled funds, (3) undercapitalization of EQK, (4) that ARI treated ART's property as its own, (5) that ARI, EQK, and ART failed to observe corporate formalities, and (6) that adherence to the corporate form would promote injustice. Because the court will consider evidence outside the pleadings in deciding similar arguments in ARI's summary judgment motion, the court in its discretion converts ARI's Rule 12(b)(6) motion into a motion for summary judgment. *See Lopez-Santiago v. Coconut Thai Grill,* 2014 WL 840052, at *3 (N.D. Tex. Mar. 4, 2014) (Fitzwater, C.J.) (citing *U.S. ex rel. Coppock v. Northrup Grumman Corp.*, 2003 WL 21730668, at *4 (N.D. Tex. July 22, 2003) (Fitzwater, J.)) (stating that considering evidence outside the pleadings requires court to convert Rule 12(b)(6) motion into summary judgment motion). Here, the conversion will not prejudice ARI because it has already moved for summary judgment. *See* N.D. Tex. Civ. R. 56.2(b) ("Unless otherwise directed by the presiding judge, or permitted by law, a party may file no more than one motion for summary judgment."). The court will consider together the arguments in ARI's Rule 12(b)(6) motion and summary judgment motion.

A

First, the court turns to the issue of what law governs plaintiffs' alter ego claim against ARI.[54]  Defendants maintain that the law of the state of incorporation for the entity whose corporate form is at issue governs the claim as it relates to that entity.  Plaintiffs respond that Texas law applies because § 145 of the Restatement dictates that, in tort claims, courts must apply the law of the state that bears the "most significant relationship" to the claim.

When a suit is removed to federal court based on diversity jurisdiction, the district court "appl[ies] the conflict of laws rule of the state in which it sits to determine which state's substantive law should be applied." *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203 (5th Cir. 1995) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Under Texas law, "only the laws of the jurisdiction of incorporation of a foreign corporation shall govern . . . the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement."  Tex. Bus. Corp. Act Ann. art. 8.02 (Vernon 2003); *see also Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 195 (S.D. Tex. 2008) (Rosenthal, J.) (citing cases) ("[C]ourts have held that the law of the state of incorporation for the entity whose corporate form is at issue applies to determine whether to pierce the corporate veil."). Because ART is incorporated in Georgia, and EQK is incorporated in Nevada, the court applies Georgia law to determine whether ARI is an alter ego of ART and Nevada law to

---

[54]This choice of law analysis also applies to the alter ego claim against Phillips, which the court addresses next.

determine whether ARI is an alter ego of EQK.

B

The court considers first whether plaintiffs have presented sufficient evidence for a reasonable jury to find that ARI operated as an alter ego of ART.

1

"Under the alter ego doctrine in Georgia, the corporate entity may be disregarded for liability purposes when it is shown that the corporate form has been abused." *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 299 (Ga. 2005).  To succeed on an alter ego claim,

> it is necessary to show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist.  The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility. . . .  Plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control.

*Id*. (citations and internal quotation marks omitted).

2

ART was ARI's wholly-owned subsidiary from 2000 to January 17, 2012, when it was sold to One Realco.

> There is no question that under appropriate circumstances a parent corporation can set up a subsidiary to promote the parent's purposes yet maintain a separate identity from the

- 42 -

subsidiary and avoid liability for the subsidiary's actions.  A parent/subsidiary relationship does not in and of itself establish the subsidiary as either the alter ego of the parent . . . or as the parent's actual or apparent agent.

*Kissun v. Humana, Inc.*, 479 S.E.2d 751, 753 (Ga. 1997) (citing *Trans-Am. Commc'ns, Inc. v. Nolle*, 214 S.E.2d 717 (Ga. Ct. App. 1975)).

Here, however, plaintiffs have produced sufficient evidence that ARI and ART operated with a unity of interests.  Under Georgia law, the confusion of separate records and bank accounts raises a question of fact for the jury regarding an alter ego claim.  *See Cobra 4 Enters. v. Powell-Newman*, 785 S.E.2d 556, 562 (Ga. 2016), *reconsideration denied* (Apr. 1, 2016), *cert. denied* (Oct. 3, 2016).  The summary judgment evidence permits a reasonable jury to find that ARI and ART did not maintain separate bank accounts.  *See* Bertcher 10/5/16 Dep. 40 (stating that ART did not have a bank account).  *Cf. Cobra 4 Enters.*, 785 S.E.2d at 562 (holding that companies maintaining separate bank accounts evidenced lack of commingling).  The record also allows the reasonable finding that ARI and ART did not maintain separate financial records.  *See* Bertcher 10/5/16 Dep. 53 (stating that ART did not keep any books or accounting); Bertcher 12/6/16 Dep. 81 (noting that ART did not keep separate accounting records from ARI).  And a reasonable jury could find from the summary judgment evidence that ARI did not reflect the transfer of EQK from ART to ARI on its books, nor did it record the charging of $101 million in administrative expenses, although

such obligation allegedly began to accrue in 2000.[55]  Additionally, plaintiffs have produced evidence of an aggregate amount of $199 million in transfers from ART to ARI as "deemed dividends" from 2000-2011, without the board of directors' approval and filing of paperwork.  A reasonable jury could find that these transfers were not recorded in any formal accounting documents or dividend declarations,[56] and that they did not comply with generally accepted accounting principles, which suggest that they should have been netted against ART's intercompany liability.

A reasonable jury could thus find that ART was undercapitalized after the allegedly fraudulent transfers in January 2011.  "[F]or undercapitalization of a corporation to justify piercing the corporate veil, it must be coupled with evidence of an intent at the time of the capitalization to improperly avoid future debts of the corporation."
*Boswell v. Primary Care Professionals, P.C.*, 594 S.E.2d 725, 728 (Ga. Ct. App. 2004) (citing *Hickman v. Hyzer*, 401 S.E.2d 738 (Ga. 1991)).  The timing of such transfers, coupled with a disregard for corporate formalities, permits the reasonable finding that ARI executed transfers of funds from ART in order to evade creditors.  *See Hickman*, 401 S.E.2d at 740 ("[G]rossly inadequate capitalization and preferential payments may, under some circumstances, rise to a level of abuse of the corporate form[.]")

---

[55]ARI charged ART for these expenses one week before Bertcher's deposition in the 2013 bankruptcy case.

[56]This transfer occurred during the 1999 litigation, following the entry of judgment against ART.

ARI maintains that, when ART was formed and capitalized in 1999, ARI was not in existence. But the "time of the capitalization" relevant to the alter ego inquiry is the period of time following the entry of judgment against ART until the present. At this time, if plaintiffs' allegations are true, defendants operated ART as an instrumentality of ARI. ARI offers no valid reason for why the court should consider the inception of ART in 1999 as the relevant time period.

3

Construing the evidence in plaintiffs' favor, a reasonable jury could find that ARI operated as the alter ego of ART. "[W]hether a subsidiary company is the alter ego of a parent company and whether the subsidiary company was formed to promote injustice or protect fraud are generally questions for the trier of fact, not the court on summary adjudication." *Mark Six Realty Assocs., Inc. v. Drake*, 463 S.E.2d 917, 922 (Ga. Ct. App. 1995) (internal citation omitted); *see also J-Mart Jewelry Outlets, Inc. v. Standard Design*, 462 S.E.2d 406, 407-08 (Ga. Ct. App. 1995) ("when litigated, the issue of 'piercing the corporate veil' is for the jury[,]' unless there is no evidence sufficient to justify disregarding the corporate form.") (internal citations omitted). Thus the court denies ARI's motion for summary judgment on the alter ego claim with regard to ART.

C

The court now turns to the claim that ARI acted as alter ego of EQK under Nevada law.

Under Nevada law, the elements for finding an alter ego are:

> (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice.

*LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 846 (Nev. 2000). Under the second prong, courts analyze a number of factors: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities. *See JSA, LLC v. Golden Gaming, Inc.*, 2013 WL 5437333, at *5 (Nev. Sep. 25, 2013). "These factors are indicative of an alter-ego relationship, 'but no one factor is determinative.'" *In re Horrocks*, 2016 WL 1359376, at *10 (Bankr. E.D. Pa. Apr. 4, 2016) (applying Nevada law) (citing *Brown v. Kinross Gold U.S.A., Inc.*, 531 F.Supp.2d 1234, 1242 (D. Nev. 2008)). When evaluating an alter ego claim, "the 'circumstances of each case' and the interests of justice should control[.]" *LFC Mktg. Grp., Inc.*, 8 P.3d at 847 (internal citation omitted).

The summary judgment record permits the reasonable finding that ARI exercised control of EQK and that the two entities shared a unity of interests. First, plaintiffs have presented evidence that ARI controlled EQK. Bertcher testified that, in 2011, although EQK was a subsidiary of ART, ARI treated EQK as though it directly owned it. *See Clapper IV*,

2017 WL 978098, at *1 (same).

ARI maintains that it did not exclusively govern EQK and thus cannot be shown to have controlled EQK. But it is not clear that a lack of exclusive control or governance would cause an alter ego claim to fail automatically under Nevada law. *See LFC Mktg. Grp., Inc.,* 8 P.3d at 846 (first element is that "the corporation must be influenced and governed by the person asserted to be the alter ego"). ARI cites *Horrocks*, 2016 WL 1359376, at *9, for the proposition that "Nevada courts look to exclusive governance of a company as proof that a shareholder held improper influence." But the cases that *Horrocks* cites do not clearly state that, without exclusive governance, a defendant cannot be held liable under an alter ego theory of liability. For example, in *Lorenz v. Beltio, Ltd.*, 963 P.2d 488 (Nev. 1998), the court noted in its alter ego analysis that the defendants were sole shareholders and directors of the company, but it did not state that without exclusive governance plaintiff's alter ego claim would fail. *Id.* at 496-97. Similarly, in *In re Giampietro*, 317 B.R. 841 (Bankr. D. Nev. 2004), although the court held that defendant had the requisite influence because he was the "sole flesh-and-blood person" connected with the company, it did not state that requisite influence could not be shown without exclusive governance. *Id.* at 851.

Furthermore, the summary judgment record would allow a reasonable jury to find that EQK and ARI commingled funds and failed to abide by corporate formalities. Plaintiffs have produced evidence that from 2000 onward, $61 million was transferred from EQK to ARI without written documentation or approval from the board of directors. This transfer is referred to inconsistently throughout the summary judgment record: accounting records refer

to it as an "intercompany loan," while Bertcher refers to it as a "deemed dividend."[57]  As the court explains *supra* in § V(B), plaintiffs have offered Frazee's opinion that these transfers did not occur in accordance with traditional accounting principles.  Plaintiffs have also presented evidence that an additional $76 to $95 million in expenses, previously unrecorded in any accounting books, was charged to EQK by ARI in January 2011.  Finally, plaintiffs point to evidence that the transfer of EQK from ART to ARI was done without documentation in ARI's financial statements and records.  A reasonable jury could find that these unrecorded transactions evince a general tendency of ARI to treat EQK's assets as its own, and that ARI is an alter ego of EQK.

Accordingly, the court denies ARI's summary judgment motion to the extent it seeks dismissal of plaintiffs' alter ego claim.

## IX

The court now turns to plaintiffs' alter ego claim against Phillips.[58]  As described *supra* in § VIII(A), because ART is incorporated in Georgia, and ARI and EQK are incorporated in Nevada, the court applies Georgia law to the alter ego claim as it relates to

---

[57]"Our position was and is that it was a deemed dividend, essentially a deemed dividend through the years.  There was nothing to offset because there was nothing owed." Bertcher 12/6/16 Dep. 102.

[58]Phillips moves under Rule 12(b)(6) to dismiss plaintiffs' alter ego claim against him. He maintains that plaintiffs have not pleaded facts from which the court could plausibly infer an alter ego relationship under either Georgia or Nevada law.  For the reasons stated *supra* in note 53, the court in its discretion converts Phillips' Rule 12(b)(6) motion into a summary judgment motion and considers the arguments in the motion together with those in Phillips' summary judgment motion.

ART and Nevada law to the alter ego claim as it relates to ARI and EQK.

A

The court first considers Phillips' argument that plaintiffs have not shown that he is an alter ego of ARI and EQK under Nevada law.[59]

1

Phillips maintains that the plaintiffs have not shown that he exercised control because they have not established that he was an owner of, or that he had sole control of, ARI and EQK. Plaintiffs respond that sole control is not required for an alter ego claim under Nevada law, and they rely on findings by the bankruptcy court that Phillips controlled ARI. They also cite evidence that Phillips regularly approved checks issued by Pillar, in particular payment to the director of ARI.

The summary judgment evidence would permit a reasonable jury to find that Phillips controlled and governed ARI and EQK. The bankruptcy court found "overwhelming evidence at trial" to support the finding that "Phillips had control of [ARI]." Ps. 5/12/17 App. 20. Plaintiffs offer the testimony of Bertcher, who served as Chief Financial Officer of Pillar. This testimony includes evidence that Phillips was the final decisionmaker on the issuance of checks by Pillar, the company that operated ARI and its subsidiaries. *See*

---

[59]Plaintiffs move for leave to file supplemental appendixes to plaintiffs' response to Phillips' motion for summary judgment. Plaintiffs also move for leave to supplement the record as to plaintiffs' response to Phillips' motion for summary judgment. Because these appendixes do not change the outcome of the court's decision on the alter ego claim against Phillips, the motions are granted.

Bertcher 6/26/16 Dep. 15 (Bertcher provided Phillips with invoices and legal bills paid by Pillar); *see also* Phillips Dep. 57 (Phillips "okay[ed]" the checks paid by Pillar). In particular, Phillips approved the payment of the fee to the director at ARI. *See id.* at 42. Bertcher's testimony also indicates that Phillips "review[ed]" what was going on in Pillar on an "ongoing" basis.[60] Bertcher 12/6/16 Dep. 341. Thus the summary judgment evidence allows the reasonable finding that Phillips exercised control of ARI through Pillar. *See JSA LLC*, 2013 WL 5437333, at *5 (stating that supervision of management and operations suffices to show control). And because the summary judgment record also permits the reasonable finding that ARI was an alter ego of EQK, as described *supra* in § VIII(C), the evidence also permits the reasonable inference that Phillips' control of ARI through Pillar extended to EQK.

Phillips' lack of ownership and sole control of ARI and EQK does not change this result. The absence of corporate ownership is not dispositive of an alter ego claim. *See LFC Mktg. Grp.*, 8 P.3d at 847 ("Although ownership of corporate shares is a strong factor favoring unity of ownership and interest, the absence of corporate ownership is not automatically a controlling event."). And even assuming *arguendo* that the complaint unequivocally establishes that Phillips did not exercise exclusive control of ARI and EQK,[61]

---

[60]According to Bertcher, Phillips' family owns 85% of Pillar. ARI's 2011 10-K filing indicates that the sole stockholder of Pillar is Realty Advisors, which has been described as Phillips' "personal" company.

[61]Defendants maintain that the complaint concedes a lack of exclusive control of ARI and EQK by Phillips. Plaintiffs allege:

for the reasons stated *supra* at § VIII(C)(2), the court holds that lack of exclusive governance under Nevada law does not automatically cause an alter ego claim to fail, and it declines to grant summary judgment to Phillips on this ground.

2

Phillips next points to a lack of evidence of unity of interests between Phillips and ARI: plaintiffs have shown no commingling of funds; no undercapitalization; no unauthorized diversion of funds; no treatment of ARI's assets as his own; and no failure to observe corp formalities.

Plaintiffs have shown evidence of a commingling of funds between Phillips and ARI as well as Phillips and EQK. A jury could reasonably find that ARI paid the monthly mortgage on Phillips' home based on a monthly check paid by ARI to Compass Bank for $6,602.00 on property in Gaywood. The record also contains evidence of the commingling of EQK's and Phillips' assets. In particular, the testimony of Louis Corna, a senior officer for Pillar, indicates that the ownership of the private plane used by both Phillips personally and EQK was unclear. In Phillips' deposition, he denied owning a plane but stated that he used the company plane for personal matters six to eight times a year. And EQK pledged

---

> [a]t all relevant times, it has been admitted in filings with the SEC that Gene Phillips is involved in the daily consultation with officers of Prime, Inc., Prime, LLC and Pillar and has significant influence over the conduct of Prime, Inc., Prime, LLC and Pillar's business, which in turn, controls all of the day to day operations of ART, ARI, and EQK.

4th Am. Compl. ¶ 128.

161,959 shares of its stock holdings as collateral for a loan to Phillips' "private company," Realty Advisors. Given that no one factor is dispositive, the absence of evidence of the other factors does not mean that plaintiffs automatically fail to satisfy the second element of an alter ego claim.

Phillips finally points to a lack of evidence that injustice would be promoted in adhering to the corporate form. The court disagrees. Assuming *arguendo* that Phillips is an alter ego of ARI and EQK, then ARI's and EQK's liability for fraudulent conveyance would lead Phillips' own assets to potentially be subject to the judgment. In that case, adhering to the corporate form, and thus shielding Phillips from liability, would deprive plaintiffs of the money to which they are entitled.

Accordingly, the court denies Phillips' motion for summary judgment on the alter ego claim as to ARI and EQK.

B

The court considers next Phillips' argument that plaintiffs have not shown that he is an alter ego of ART under Georgia law.

Phillips first contends that because he is not a shareholder or owner of ART, plaintiffs cannot succeed on their alter ego claim. Phillips points to a lack of evidence of: disregard for the corporate entity of ART; Phillips' involvement in undercapitalization of ART with intent to avoid future debts; fraud, failure to observe corporate formalities to the detriment of plaintiffs; non-functioning of ART's officers and directors; commingling of Phillips' assets with those of ART. Phillips also posits that plaintiffs offer no evidence that adhering

to ART's form would promote injustice or fraud.

Even assuming *arguendo* that Phillips exercised control of ART, plaintiffs have offered no evidence of any of the other factors the court analyzes under Georgia law. Control on its own does not suffice to establish an alter ego relationship. "[A] corporation and its shareholders and officers are separate, even if one person owns all of its shares and controls its actions." *United States v. Fid. Capital Corp.*, 920 F.2d 827, 836 (11th Cir. 1991) (applying Georgia law). Only "[w]hen the person who owns or controls the corporation has abused this privilege" may the court "pierce the corporate veil in order to correct the abuse." *Id.*

Here, plaintiffs have failed to produce any evidence that Phillips abused ART's corporate form through his control. In response, plaintiffs offer evidence that Phillips' assets were commingled with those of other entities. Plaintiffs present evidence that Pillar's and Phillips' personal assets were commingled, i.e. that Pillar pays for Phillips' and his wife's cell phones. Plaintiffs also present evidence of commingling between Phillips' and ARI's assets, or Phillips' and BCM's assets. But commingling of these assets does not alone permit the reasonable inference that Phillips' and ART assets are commingled by virtue of the fact that ART is a wholly-owned subsidiary of ARI or that BCM is a wholly-owned subsidiary of ART. *See Kissun*, 479 S.E.2d at 754 ("A parent/subsidiary relationship does not in and of itself establish the subsidiary as . . . the alter ego of the parent[.]"). A reasonable jury could not find based on the summary judgment record that ART and Phillips share a unity of interest.

Nor have plaintiffs offered evidence of any other indicia of an alter ego relationship, including, *inter alia*, that adhering to ART's corporate form, as it relates to Phillips, would promote injustice. Thus a reasonable jury could not find that Phillips abused his privilege through the ART corporate form.

Accordingly, the court grants summary judgment as to plaintiffs' claim that Phillips is an alter ego of ART.

X

Defendants move to dismiss plaintiffs' requests for injunctive relief.

To the extent plaintiffs request entry of preliminary injunction, the court has already denied this request for the reasons stated in *Clapper v. Am. Realty Inv'rs, Inc.*, 2015 WL 264711, at *6 (N.D. Tex. Jan. 21, 2015) (Fitzwater, J.).

To the extent plaintiffs request permanent injunctive relief, the court denies defendants' motion to dismiss and will determine following the trial the appropriate relief to afford the parties.

XI

Plaintiffs also move for summary judgment on defendants' affirmative defenses of unclean hands and equitable estoppel. Defendants respond that plaintiffs are seeking to transfer money away from ART Midwest through this lawsuit. They posit that plaintiffs are delaying pursuit of a related Michigan lawsuit that would lead to a disadvantageous distribution of ART Midwest's assets. These conclusory assertions, however, do not allow defendants to avoid summary judgment on their affirmative defenses. *See, e.g., Orthopedic*

*& Sports Injury Clinic v. Wang Lab. Inc.*, 922 F.2d 220, 224 (5th Cir. 1991) ("[T]here is a level of conclusoriness below which an affidavit must not sink if it is to provide the basis for a genuine issue of material fact."). Accordingly, the court dismisses defendants' affirmative defenses of unclean hands and equitable estoppel.

*   *   *

For the reasons stated, the court denies defendants' collective motion to dismiss; grants in part and denies in part ART's motion to dismiss; grants in part and denies in part ARI's motion to dismiss; grants in part and denies in part EQK's motion to dismiss; grants in part and denies in part Phillips' motion to dismiss[62]; grants in part and denies in part plaintiffs' motion for partial summary judgment; denies ART's motion for summary judgment; grants in part and denies in part ARI's motion for summary judgment; grants in part and denies in part EQK's motion for summary judgment; and raises *sua sponte* that ARI and EQK are entitled to summary judgment dismissing plaintiffs' unjust enrichment claim.[63] The court dismisses plaintiffs' fraudulent transfer claim and alter ego claim against Phillips to the extent set out in this memorandum opinion and order.

The court gives plaintiffs 21 days from the date this memorandum opinion and order is filed to file an opposition response, brief, and appendix that addresses the ground on which

---

[62]The court grants the part of this motion to dismiss that addresses plaintiffs' alter ego claim and that has been converted to a summary judgment motion. *See supra* note 53.

[63]Because the motions are no longer pending, the court denies as moot Phillips' motion to stay proceedings pending rulings on pending motions and brief in support thereof.

the court has raised summary judgment *sua sponte*. *See supra* § VII.

   **SO ORDERED**.

   August 14, 2018.

_____

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE